768 N.E.2d 391 (2002)
329 Ill. App.3d 781
263 Ill.Dec. 631
ARANGOLD CORPORATION, d/b/a Arango Cigar Company, Plaintiff-Appellant,
v.
Kenneth ZEHNDER, as Director of the Illinois Department of Revenue; Judy Baar Topinka, as Treasurer of the State of Illinois; and The Department of Revenue, Defendants-Appellees.
No. 1-01-1371.
Appellate Court of Illinois, First District, Fifth Division.
April 12, 2002.
*395 Duane, Morris & Heckscher LLP, Stanley R. Kaminski; McDermott, Will & Emery, John A. Biek, Melissa A. Connell, Chicago, for Appellant.
James E. Ryan, Attorney, General, Joel D. Bertocchi, Solictor General; A. Benjamin Goldgar, Assistant Attorney General, Chicago, for Appellees.
Justice GREIMAN delivered the opinion of the court:
This is an appeal from a decision of the circuit court upholding the constitutionality of the Tobacco Products Act of 1995 (Act) (35 ILCS 143/10-1 et seq. (West 1996)). The Act imposes a tax on various tobacco products other than cigarettes such as cigars and chewing tobacco and allocates the revenues to the state's Long-Term Care Provider Fund. See 35 ILCS 143/10-10 (West 1996). Plaintiff Arangold Corporation (Arangold) is an Illinois corporation doing business as a wholesale tobacco distributor subject to the tax. Defendants are the Illinois Department of Revenue (Department), Kenneth Zehnder, then-director of the Department, and State Treasurer Judy Baar Topinka.
In November of 1995, plaintiff filed a four-count complaint challenging the validity of the Act. Counts I and II of the complaint alleged that the Act violated the due process and equal protection clauses of the United States and Illinois Constitutions. U.S. Const, amend. XIV; Ill. Const. 1970, art. I, § 2. Count III alleged that the Act violated the uniformity clause of the Illinois Constitution. Ill. Const.1970, art. IX, § 2. Count IV alleged that the Act violated the Illinois Constitution's prohibition on special legislation. Ill. Const.1970, art. IV, § 13. In July 1996, Arangold moved for summary judgment on all four counts of its complaint, which was denied.
Meanwhile, on June 27, 1997, Arangold amended its complaint to challenge Public Act 89-21 (Pub. Act 89-21, eff. June 6, 1995, July 1, 1995, January 1, 1996), the legislative enactment that included the Act, as violating the single subject rule of the Illinois Constitution (Ill. Const.1970, art. IV, § 8(d)). Arangold moved for summary judgment on its single subject claim, and on April 9, 1998, the circuit court granted the motion and issued a decision invalidating Public Act 89-21. The defendants appealed that decision directly to the Illinois Supreme Court under Supreme Court Rule 302 (134 Ill.2d R. 302).
Before the supreme court, the parties argued the single subject rule, as well as the due process clause and the uniformity *396 clause. On July 1, 1999, the court reversed the trial court's judgment, concluding that Public Act 89-21 did not violate the single subject rule. See Arangold Corp. v. Zehnder, 187 Ill.2d 341, 356, 240 Ill.Dec. 710, 718 N.E.2d 191 (1999). However, the court declined to rule on the other challenges to the Act and instead remanded the case for further proceedings. Zehnder, 187 Ill.2d at 360, 240 Ill. Dec. 710, 718 N.E.2d 191.
In March of 2000, defendants filed a motion for summary judgment on the due process, equal protection, special legislation, and uniformity counts. The trial court heard oral arguments in April of 2000 and, on March 14, 2001, granted defendants' motion. This appeal followed. However, on appeal, Arangold has abandoned its equal protection and special legislation claims and has dropped its argument that the Act unreasonably discriminates between different classes of competing tobacco distributors. For the following reasons, we affirm.
The Act imposes a tax on any person engaged in business as a distributor of tobacco products in Illinois at the rate of 18% of the wholesale price of the tobacco products sold or otherwise disposed of in Illinois. "Tobacco products" are defined under the Act to include cigars, pipe tobacco, snuff, chewing tobacco, and other types of noncigarette tobacco products. 35 ILCS 143/10-5 (West 1996). However, it explicitly excludes "cigarettes or tobacco purchased for the manufacture of cigarettes by cigarette distributors and manufacturers." 35 ILCS 143/10-5 (West 1996).
In addition, the Act expressly designates how revenues under the Act are to be used. Section 10-10 provides: "All monies received by the Department [of Revenue] under this Act shall be paid into the Long-Term Care Provider Fund of the State Treasury." 35 ILCS 143/10-10 (West 1996). The Long-Term Care Provider Fund (Fund) receives and distributes monies to skilled or intermediate nursing facilities under Title XIX of the Social Security Act (known as the Medicaid program) and in accordance with article V-B of the Public Aid Code (305 ILCS 5/5B-1 et seq. (West 1996)). See 305 ILCS 5/5B-8 (West 1996). Both the Medicaid program and the medical assistance article of the Public Aid Code are intended to provide care for people whose income and resources are inadequate to meet their medical needs.
However, not all of the monies in the Fund come from tax revenues under the Act. The Fund is also supported by matching federal funds (305 ILCS 5/5B-8(c)(2) (West 2000)), any balance in the Medicaid Long-Term Care Provider Participation Fund (305 ILCS 5/12-5 (West 2000)), certain proceeds in the Cigarette Tax Act (35 ILCS 130/2 (West 2000)), and Cigarette Use Tax Act (35 ILCS 135/35 (West 2000)), and occasional transfers from the General Revenue Fund. For the 1996 fiscal year, revenues from the Act supplied $9,904,390.72 of the $423,777,581.28 placed in the Fund, or approximately 2%.
With regard to the plaintiff's uniformity clause challenge,[1] the parties offered competing articles, affidavits, and purported admissions of the defendants following their failure to answer a request to admit *397 evidence. Essentially, this evidence was submitted to inform the court on the issues of whether the tobacco products subject to the Act cause or are associated with circulatory diseases, respiratory diseases, and cancer, and whether persons afflicted with those diseases commonly are affiliated with or benefit from long-term health care. Not surprisingly, the parties were in unwavering disagreement as to the answers to those questions.
However, on March 14, 2001, the court entered a decision and judgment order granting the defendants' motion for summary judgment on Arangold's two remaining claims and upholding the constitutionality of the Act. Before addressing the merits of those claims, the court made two preliminary observations. First, it characterized Arangold's response to the defendants' motion as "an anachronism." It noted:
"In most recent litigation involving tobacco products, the tobacco industry has taken the tack that the use of tobacco is dangerous, so directly connected to disease, and such a clear and apparent cause of millions of deaths, that every person should be charged with that general knowledge for purposes of deciding such issues as whether the dangers of tobacco are open and obvious (e.g., McKay v. Republic Tobacco, [No. 00-2366, 2001 WL 122223] (E.D.Penn., February 13, 2001); Gibbs v. Republic Tobacco, 119 F.Supp.2d 1288 (Mid.Dist.Fl., 2000)), and whether there existed common knowledge of deleterious effects of tobacco when [an] individual harmed from tobacco began use decades earlier (e.g., Glassner v. R.J. Reynolds and Philip Morris, Inc., 223 F.3d 343 (6th Cir., 2000)).
Here, however, the plaintiff is not trying to still the claim of a product liability or personal injury suit brought by a person afflicted with lung cancer or pulmonary disease, but rather is trying to advance its constitutional claims that the Act is void. Since these claims depend on a showing that there is no relationship between the tobacco use and nursing home admissions, the plaintiff has reverted to the litigation tact of the past by arguing, literally, that tobacco is no more dangerous to health than refined sugar, red meat, or commercial whole milk.
The second observation is that resolution of a constitutional challenge to a taxing statute often does not hinge on the competing affidavits of the parties or on such factors as responses to requests to admit facts. * * * [L]egislative enactments are entitled to considerable deference by the courts and, to this end, are cloaked in a presumption of constitutionality. Under the rational basis test which is most often used to measure the constitutionality of a tax classification, 'legislative choice is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data.' Federal Communications Comm'n v. Beach Communications, Inc., [508 U.S. 307, 315], 113 S.Ct. 2096[, 2102, 124 L.Ed.2d 211, 222] (1993); and Nordlinger v. Hahn, [505 U.S. 1, 15], 112 S.Ct. 2326, 2334 [120 L.Ed.2d 1, 15-16] (1992). In general terms, this cloak may be removed only upon a failure of the taxing authority to propose a justification for the tax classifications or, if a justification is provided, proof by the party challenging the tax that the proposed justification is unsupported by the facts or insufficient as a matter of law. Milwaukee Safeguard Insurance Co. v. Selcke, 179 Ill.2d 94, 98-99, 227 Ill.Dec. 731, 688 N.E.2d 68 (1997). The net result of these standards is that summary judgment in favor of the defendants is not precluded *398 simply because the plaintiff has produced affidavits to support the notion that the Tax is unrelated to its purpose and that there have been certain facts admitted by the defendants."
Looking first to Arangold's uniformity claim, the court stated it was unavailing, as the defendants had offered an adequate justification for the tax that was directly related to the legislation's purpose: "tobacco use causes disease in users and the object of the Act is to provide funding for those users who become in need of long term care and can't themselves afford such care."
The court then addressed Arangold's argument that defendants' justification lacked a factual basis because it singled out distributors of tobacco products for a tax designed to fund nursing home care for the poor. It noted that plaintiff had conceded that "(1) the defendants submitted evidence showing a causal relationship between consumption of tobacco products and `a higher incidence of certain cancers, circulatory and respiratory diseases'; and (2) that the National Nursing Home Survey, which was submitted to the court by the plaintiff, does indicate `an incidence of cancers and circulatory and respiratory diseases among nursing home residents.'"
Accordingly, the court rejected Arangold's argument that the General Assembly was not entitled to infer a relationship between the two groups, deeming plaintiff's argument to be "far too fine given the considerable measure of deference which must be allowed legislative classifications." Ultimately, in finding the classification rational, it focused especially on data from the National Nursing Home Survey that established that one of every third admission to nursing homes is due to diseases commonly associated with the use of tobacco products. Such a statistic, it concluded, rendered the rationality of the classification in the Act "unassailable."
Lastly, the court rejected Arangold's due process claim that the Act's tax of a narrow group of taxpayers to fund a general welfare program of the State was "inherently unreasonable." In its argument, Arangold focused on two decisions, Crocker v. Finley, 99 Ill.2d 444, 77 Ill.Dec. 97, 459 N.E.2d 1346 (1984), and Boynton v. Kusper, 112 Ill.2d 356, 98 Ill.Dec. 208, 494 N.E.2d 135 (1986). In those cases, the supreme court invalidated fees charged to file divorce actions and to obtain marriage licenses, respectively, which were to be used to prevent domestic violence. Specifically, the supreme court found that the relationship between the exercise of the rights that were taxed in each case and the goal of preventing domestic violence was too remote. Conversely, the trial court in the present case found those cases to be inapposite. Here, it claimed, because Arangold had no right equivalent to the right to marry or divorce and because it failed to show that the relationship between tobacco use and the need for nursing home care was "too remote to satisfy the rationalrelation test," the court ruled that the due process claim was meritless.
In an appeal from an order granting summary judgment, the standard of review is de novo. Outboard Marine Corp. v. Liberty Mutual Insurance Co., 154 Ill.2d 90, 102, 180 Ill.Dec. 691, 607 N.E.2d 1204 (1992). Summary judgment is warranted when "`the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.' [Citation.]" Dowd & Dowd, Ltd. v. Gleason, 181 Ill.2d 460, 483, 230 Ill.Dec. 229, 693 N.E.2d 358 (1998). However, when "determining whether the moving party is entitled to *399 summary judgment, the court will construe the pleadings, depositions, admissions and affidavits strictly against the movant and liberally in favor of the opponent." Kolakowski v. Voris, 83 Ill.2d 388, 398, 47 Ill.Dec. 392, 415 N.E.2d 397 (1980). Of course, an order granting summary judgment must be reversed if the evidence shows that a genuine issue of material fact exists or if the judgment was incorrect as a matter of law. In re Estate of Herwig, 237 Ill.App.3d 737, 741, 178 Ill.Dec. 641, 604 N.E.2d 1164 (1992).
Moreover, a circuit court decision relating to the constitutionality of a statute is also reviewed de novo. Russell v. Department of Natural Resources, 183 Ill.2d 434, 441, 233 Ill.Dec. 782, 701 N.E.2d 1056 (1998). Because this court must assume that the legislature intended to comply with the constitution (Tully v. Edgar, 171 Ill.2d 297, 313, 215 Ill.Dec. 646, 664 N.E.2d 43 (1996)), statutes carry a "strong presumption of constitutionality." Russell, 183 Ill.2d at 441, 233 Ill.Dec. 782, 701 N.E.2d 1056; In re S.G., 175 Ill.2d 471, 486, 222 Ill.Dec. 386, 677 N.E.2d 920 (1997). The party challenging a statute has the burden of "clearly establishing" its unconstitutionality. Russell, 183 Ill.2d at 441, 233 Ill.Dec. 782, 701 N.E.2d 1056; People ex rel. Devine v. Murphy, 181 Ill.2d 522, 527, 230 Ill.Dec. 220, 693 N.E.2d 349 (1998).
Accordingly, as the defendants point out, in considering whether that burden has been met, this court has "a duty to sustain legislation whenever possible." In re Marriage of Lappe, 176 Ill.2d 414, 422, 223 Ill.Dec. 647, 680 N.E.2d 380 (1997). Moreover, it has a duty to construe a statute to find it constitutional if "reasonably possible." People ex rel. Lumpkin v. Cassidy, 184 Ill.2d 117, 123, 234 Ill.Dec. 389, 703 N.E.2d 1 (1998); Devine, 181 Ill.2d at 527, 230 Ill.Dec. 220, 693 N.E.2d 349. In short, all doubts must be resolved in favor of upholding the statute. Lappe, 176 Ill.2d at 422, 223 Ill.Dec. 647, 680 N.E.2d 380,
Plaintiff's first argument is that the Act violates the due process clauses of both the Illinois and United States Constitutions. If a tax statute is to comport with due process, it may not be arbitrarily imposed. Rather, it notes, "an act of the legislature must bear a reasonable relationship to the public interest sought to be protected, and the means adopted must be a reasonable method of accomplishing the chosen objective." Crocker, 99 Ill.2d at 456, 77 Ill.Dec. 97, 459 N.E.2d 1346; Boynton, 112 Ill.2d at 367, 98 Ill.Dec. 208, 494 N.E.2d 135.[2] This is the minimum requirement of the due process clause's "rational basis test," and requires the lowest level of judicial scrutiny where a challenge to a statute does not affect a fundamental right or involve a suspect or quasisuspect classification. In re Petition of the Village of Vernon Hills, 168 Ill.2d 117,123, 212 Ill.Dec. 883, 658 N.E.2d 365 (1995).
As both plaintiff and defendants note, in applying the rational basis test, a court must "identify the public interest that the statute is intended to protect, examine whether the statute bears a reasonable relationship to that interest, and determine whether the method used to protect or further that interest is reasonable." People v. Lindner, 127 Ill.2d 174, 180, 129 Ill.Dec. 64, 535 N.E.2d 829 (1989). If the court determines that the legislation *400 is selectively imposed relative to the objective of the law, the legislation will be deemed "arbitrary" and cannot stand as a reasonable classification. Grasse v. Dealer's Transport Co., 412 Ill. 179, 195-96, 106 N.E.2d 124 (1952).
However, to meet the test, it is not necessary that the legislature even have described its goal or articulated its purposes in enacting the statute. Heller v. Doe, 509 U.S. 312, 320, 113 S.Ct. 2637, 2642, 125 L.Ed.2d 257, 270 (1993). Indeed, the court may simply "hypothesize reasons for the legislation" even if those reasons did not motivate the legislature. Lumpkin, 184 Ill.2d at 124, 234 Ill.Dec. 389, 703 N.E.2d 1. As long as there is any "conceivable basis" for the legislation (Lumpkin, 184 Ill.2d at 124, 234 Ill.Dec. 389, 703 N.E.2d 1), any "reasonably conceivable state of facts" showing the legislation is rational, the legislation must be upheld. Heller, 509 U.S. at 320, 113 S.Ct. at 2642, 125 L.Ed.2d at 270; Miller v. Rosenberg, 196 Ill.2d 50, 59, 255 Ill.Dec. 464, 749 N.E.2d 946 (2001).
Accordingly, as such standards suggest, rational basis review is "limited" (Miller, 196 Ill.2d at 59, 255 Ill.Dec. 464, 749 N.E.2d 946) and "highly deferential" (Committee for Educational Rights v. Edgar, 174 Ill.2d 1, 33, 220 Ill.Dec. 166, 672 N.E.2d 1178 (1996)), "a paradigm of judicial restraint" (Beach, 508 U.S. at 314, 113 S.Ct. at 2101, 124 L.Ed.2d at 221). Because the legislature has "broad discretion" in creating statutory classifications and is allowed "great flexibility in addressing the different needs throughout the State" (Cutinello v. Whitley, 161 Ill.2d 409, 418, 421, 204 Ill.Dec. 136, 641 N.E.2d 360 (1994)), legislation examined only for rationality enjoys "a strong presumption of validity." Heller, 509 U.S. at 319, 113 S.Ct. at 2642, 125 L.Ed.2d at 270. This is why the burden is on the challenger to "`negative every conceivable basis which might support it.' [Citation.]" Heller, 509 U.S. at 320, 113 S.Ct. at 2643, 125 L.Ed.2d at 271.
Utilizing this test, however, the plaintiff argues the supreme court has held that an "arbitrary classification for tax purposes places upon the members of a class a burden not shared by others" when the object of the tax legislation is the funding of a general welfare program of the state. Crocker, 99 Ill.2d at 457, 77 Ill.Dec. 97, 459 N.E.2d 1346. In other words, it asserts, a tax selectively imposed on a narrow class of taxpayers to fund a general welfare program of the state that is designed to benefit all is arbitrary legislation that cannot bear a reasonable relationship to the object of the legislation, nor be a reasonable method to achieve that objective. Boynton, 112 Ill.2d at 367, 98 Ill.Dec. 208, 494 N.E.2d 135.
In Crocker, the plaintiff's challenged the validity of a statute that required circuit court clerks to collect a special $5 filing fee from petitioners for dissolution of marriage "to fund shelters and other services for victims of domestic violence in Illinois." Crocker, 99 Ill.2d at 447-48, 77 Ill.Dec. 97, 459 N.E.2d 1346. The fee was collected to enable the Department of Public Aid to carry out the provisions of the Domestic Violence Shelter and Service Fund. Crocker, 99 Ill.2d at 447-48, 77 Ill.Dec. 97, 459 N.E.2d 1346. Ultimately, the central issue was whether the legislature could impose such a fee upon a limited group of plaintiffs where the funds collected went into the State Treasury to fund a general welfare program. Crocker, 99 Ill.2d at 451, 77 Ill.Dec. 97, 459 N.E.2d 1346.
The court in Crocker found that "[t]he $5 charge at issue, referred to by statute * * *, is in reality a tax." Crocker, 99 Ill.2d at 452, 77 Ill.Dec. 97, 459 N.E.2d 1346. As for whether the tax violated the *401 reasonable basis test of the due process clause, the court stated:
"Plaintiffs claim that, although the tax collected is nominal in amount, the statute arbitrarily imposes the burden of funding a general welfare program on a narrow group of matrimonial litigants. According to plaintiffs, the statute therefore deprives them of property without due process of law. We agree that the statute is unconstitutional in this respect." Crocker, 99 Ill.2d at 456, 77 Ill.Dec. 97, 459 N.E.2d 1346.
In other words, in finding that the $5 tax was arbitrary and unreasonable, the supreme court found that "the legislature chose to fund domestic violence shelters and programs" by taxing the plaintiff, even though "[t]hese services are available to all adults and their dependents who are the subject of domestic violence." Crocker, 99 Ill.2d at 456, 77 Ill.Dec. 97, 459 N.E.2d 1346. Accordingly, the court found this choiceto tax divorce petitionersto be "an arbitrary use of the police power, inconsistent with due process guarantees." Crocker, 99 Ill.2d at 457, 77 Ill.Dec. 97, 459 N.E.2d 1346.
In Boynton, the supreme court was asked to determine whether a $10 fee collected for issuing a marriage license violated the due process clause since the fee was also imposed partially to fund the State's "Domestic Violence Shelter and Service Fund." Boynton, 112 Ill.2d at 360, 98 Ill. Dec. 208, 494 N.E.2d 135. The court held that this "fee," like the fee in Crocker, was actually a "tax." Boynton, 112 Ill.2d at 365, 98 Ill.Dec. 208, 494 N.E.2d 135. Put another way, the court stated that the issue was "whether our legislature may impose a `fee' upon a class of people based only on the fact that they have applied for marriage licenses, where the money collected is used to fund a general welfare program." Boynton, 112 Ill.2d at 362, 98 Ill.Dec. 208, 494 N.E.2d 135.
As in Crocker, the court acknowledged that there was "some" relationship between persons being taxed (i.e., marriage license recipients) and those who may make use of domestic violence shelters. Boynton, 112 Ill.2d at 367, 98 Ill.Dec. 208, 494 N.E.2d 135. However, the court again found that such a relationship was not sufficient to rationally justify excluding all other taxpayers from bearing the burden of the general welfare program. Boynton, 112 Ill.2d at 367-68, 98 Ill.Dec. 208, 494 N.E.2d 135. Instead, the court held that the cause and effect relationship between marriage and domestic violence was "irrelevant" to the constitutional inquiry, and stated that to rule otherwise would set a worrisome precedent for the General Assembly:
"If the relation between the procurement of a marriage license and domestic violence were found to be sufficient to satisfy the requirements of due process, then, as noted in Crocker (99 Ill.2d 444, 456, 77 Ill.Dec. 97, 459 N.E.2d 1346), countless other social welfare programs would qualify for monies obtained by imposing a similar tax on those who apply for marriage license. Using the same cause-and-effect test that defendants would have us apply to the relation between marriage and domestic violence, other worthy social problems can be found that are just as closely and reasonably related to marriage as is domestic violence, if not more so. Since all divorces involve people who have been married, why should not a marriage counseling program be financed by another tax on marriage licenses? Since most marriages produce children, why should we not defray certain educational costs by the imposition of yet another add-on tax to marriage licenses? Why should not such a tax be imposed for the *402 maintenance of institutions for delinquent or neglected children, and why should not yet another tax be imposed to defray juvenile-probation costs? We conclude in this case that the imposition of a tax on the issuance of a marriage license does not bear a reasonable relation to the public interest sought to be protected by the Act in question and the means adopted, that is, the imposition of the tax on marriage licenses, is not a reasonable means of accomplishing the desired objective." (Emphasis omitted.) Boynton, 112 Ill.2d at 367-68, 98 Ill.Dec. 208, 494 N.E.2d 135.
See also Northern Illinois Home Builders Ass'n v. County of Du Page, 165 Ill.2d 25, 44, 208 Ill.Dec. 328, 649 N.E.2d 384 (1995) (holding that Crocker is still valid law for prohibiting an "unreasonable and arbitrary classification for tax purposes because it imposed the burden of funding a general welfare program on a narrow group of matrimonial litigants, while excluding other classes of taxpayers"); Rose v. Pucinski 321 Ill.App.3d 92, 254 Ill.Dec. 43, 746 N.E.2d 800 (2001).
In the end, plaintiff concludes, there are also sound public policy concerns consistent with the Illinois due process clause to prohibit taxes that target narrow groups of taxpayers to expressly fund general welfare programs of the state. For, as the plaintiff posits, "[i]f chewing tobacco and cigars can be singled out to be taxed to pay for nursing home care for the poor merely because a potential nursing home resident could have an illness that may be associated with tobacco use generally, would it not be just as appropriate to single out egg distributors for taxation for similar reasons? Similarly, could not the state selectively tax distributors of red meat, candy bars, alcohol, or countless other items, to fund nursing home care for the poor as such products would possible lead to a higher incidence of illness?" To rule otherwise, it claims, would only encourage a host of special taxes singling out selective taxpayer groups specifically to fund whatever welfare programs that the state legislature would like to institute.
Despite plaintiff's thought-provoking contentions, we find that the rational relationship test is easily met. Initially, the state has an undeniably legitimate interest in preserving the health of its citizens. See New Energy Co. of Indiana v. Limbach, 486 U.S. 269, 279, 108 S.Ct. 1803, 1810, 100 L.Ed.2d 302, 312 (1988) (stating that "protection of health is a legitimate state goal"). Moreover, we also think that the Act's taxation of tobacco products is rationally related to those interests, as the General Assembly could have believed that cigars, pipes, chewing tobacco, and other tobacco products cause any number of health problems and that those problems require care in long-term health care facilities. Plaintiff conceded as much in oral arguments.
Moreover, as defendants point out, it is entirely rational for the General Assembly to formulate a tax requiring people who impose costs on society to pay some of those costs. See, e.g., Rehg v. Illinois Department of Revenue, 152 Ill.2d 504, 516, 178 Ill.Dec. 731, 605 N.E.2d 525 (1992) (holding that cannabis tax was rational because "drug dealers as a group impose immeasurable costs upon the state, but do not bear their fair share of the tax burden"), overruled on other grounds, sub nom. Wilson v. Department of Revenue, 169 Ill.2d 306, 214 Ill.Dec. 849, 662 N.E.2d 415 (1996); Leslie's Pool Mart, Inc. v. Department of Food & Agriculture, 223 Cal.App.3d 1524, 1542, 273 Cal.Rptr. 373, 386 (1990) (finding rational "Economic Poisons Act," which imposed a tax on sellers of pesticides to defray cost of protecting public from products taxed).
*403 Of course, Arangold argued before the supreme court that the General Assembly could not have reasonably found any connection between tobacco products and long-term care. On this appeal, however, Arangold has abandoned that argument with respect to its due process claim, as litigants are not permitted to second-guess the factual underpinnings of the General Assembly's legislative decisions. "The judgments made by the legislature in crafting a statute are not subject to courtroom fact finding and may be based on rational speculation unsupported by evidence or empirical data." Lumpkin, 184 Ill.2d at 124, 234 Ill.Dec. 389, 703 N.E.2d 1; Cutinello, 161 Ill.2d at 421-22, 204 Ill. Dec. 136, 641 N.E.2d 360, citing Beach, 508 U.S. at 315, 113 S.Ct. at 2102, 124 L.Ed.2d at 222. In other words, statutory rationality is not a matter of what "evidence" the parties to lawsuits succeed in mustering. Rather, the defendants had no obligation to produce evidence supporting the rationality of the Act (Heller, 509 U.S. at 320, 113 S.Ct. at 2643, 125 L.Ed.2d at 271), and all of Arangold's affidavits, statistics, and articles are therefore irrelevant.
In addition, we find Crocker and Boynton to be different from the present case in two respects. First, there does not appear to be the same "remoteness" problem of the kind that troubled the court in Boynton and Crocker. Certainly, as Arangold points out, the relationship is less than perfect, as not all poor people need long-term care because they used tobacco products. As defendants point out, however, perfection is not the standard. A statute is not irrational because it lacks "'"mathematical nicety or because in practice it results in some inequality."' [Citations.]" Heller, 509 U.S. at 321, 113 S.Ct. at 2643, 125 L.Ed.2d at 271; People v. P.H., 145 Ill.2d 209, 232, 164 Ill.Dec. 137, 582 N.E.2d 700 (1991). "'The problems of government are practical ones and may justify, if they do not require, rough accommodation.' [Citation.]" Heller, 509 U.S. at 321, 113 S.Ct. at 2643, 125 L.Ed.2d at 271. Courts are, therefore, "compelled under rational-basis review to accept a legislature's generalizations even when there is an imperfect fit between means and ends." Heller, 509 U.S. at 321, 113 S.Ct. at 2643,125 L.Ed.2d at 271.
Second, the Act does not impose the same kind of tax at issue in either Crocker or Boynton. In those cases, the taxes were intended to fund domestic violence programs for the benefit of the persons taxed, i.e., petitioners in divorce cases and applicants for marriage licenses. The court found that the taxes were objectionable because the classes of people taxed to fund the programs would not necessarily benefit from them, while classes of people who would benefit were not taxed at all. Crocker, 99 Ill.2d at 456, 77 Ill.Dec. 97, 459 N.E.2d 1346; Boynton, 112 Ill.2d at 367-68, 98 Ill.Dec. 208, 494 N.E.2d 135. The Act, however, does not levy a tax to benefit the persons taxed. As defendants point out, Arangold, the taxpayer and a corporation, would never remotely be considered a beneficiary of the Long-Term Care Provider Fund. Instead, it is designed to make Arangold pay some of the costs that its products impose. See Rehg, 152 Ill.2d at 516-17, 178 Ill.Dec. 731, 605 N.E.2d 525. It is simply not enough to object that this tax does not benefit the taxpayer.
In other words, we think that plaintiff is reading too much into Crocker and Boynton, as those opinions do not prohibit the taxing of one group to benefit another or, alternatively, they do not require that those taxed must specifically benefit from the tax. As defendants note, the Supreme Court rejected that notion almost 70 years ago in Carmichael v. Southern Coal & Coke Co., 301 U.S. 495, 57 S.Ct. 868, 81 *404 L.Ed. 1245 (1937), where the Court upheld the constitutionality of Alabama's unemployment insurance program:
"It is not a valid objection to the present tax, conforming in other respects to the Fourteenth Amendment, and devoted to a public purpose, that the benefits paid and the persons to whom they are paid are unrelated to the persons taxed and the amount of the tax which they payin short, that those who pay the tax may not have contributed to the unemployment and may not be benefited by the expenditure. Appellees' contention that the statute is arbitrary, in so far as it fails to distinguish between the employer with a low unemployment experience and the employer with a high unemployment experience, rests upon the misconception that there must be such a relationship between the subject of the tax (the exercise of the right to employ) and the evil to be met by the appropriation of the proceeds (unemployment). We have recently stated the applicable doctrine. 'But if the tax, qua tax, be good, as we hold it is, and the purpose specified be one which would sustain a subsequent and separate appropriation made out of the general funds of the Treasury, neither is made invalid by being bound to the other in the same act of legislation.' [Citation.] Nothing is more familiar in taxation than the imposition of a tax upon a class or upon individuals who enjoy no direct benefit from its expenditure, and who are not responsible for the condition to be remedied." Carmichael, 301 U.S. at 521-22, 57 S.Ct. at 878, 81 L.Ed, at 1260.
The Court went on:
"A tax is not an assessment of benefits. It is, as we have said, a means of distributing the burden of the cost of government. The only benefit to which the taxpayer is constitutionally entitled is that derived from his enjoyment of the privileges of living in an organized society, established and safeguarded by the devotion of taxes to public purposes. [Citation.] Any other view would preclude the levying of taxes except as they are used to compensate for the burden on those who pay them, and would involve the abandonment of the most fundamental principle of governmentthat it exists primarily to provide for the common good." Carmichael, 301 U.S. at 522-23, 57 S.Ct.at 1260-61, 57 S.Ct. at 878-79, 81 L.Ed, at 1260-61.
Illinois courts have done likewise. See Titus v. The Texas Co., 55 Ill.2d 437, 442, 303 N.E.2d 361 (1973) (the supreme court upheld a motor fuel tax earmarked, in part, for the construction and improvement of boating facilities, although some boaters who could not use the facilities were taxed and some that could use them were not); Ali v. Danaher, 47 Ill.2d 231, 237, 265 N.E.2d 103 (1970) (the supreme court sustained a court tax to fund a law library despite the claim that not all litigants would use the library).
As defendants' note, Arangold's view of due processthat taxes must be calibrated so that the revenues flow into a special fund for the benefit of those taxed, and only those taxed, or else into the general revenue fundwould eliminate many other tax statutes that tax specific groups and then earmark all or some of the revenues for special funds. See, e.g., 35 ILCS 105/9 (West 2000) (use tax); 35 ILCS 110/9 (West 2000) (service use tax); 35 ILCS 115/9 (West 2000) (service occupation tax); 35 ILCS 120/3 (West 2000) (retailers' occupation tax); 35 ILCS 130/2 (West 2000) (cigarette tax); 35 ILCS 135/35 (West 2000) (cigarette use tax); 35 ILCS 145/3(b) (West 2000) (hotel operators' occupation tax).
*405 In agreeing with the defendants, we reaffirm our focus on the concept of the "rational basis" test as a low hurdle. Reed v. Farmers Insurance Group, 188 Ill.2d 168, 176, 242 Ill.Dec. 97, 720 N.E.2d 1052 (1999). As noted above, a statute only fails the test when it rests on grounds "'"wholly irrelevant to achievement of the State's objective."' [Citations.]" Heller, 509 U.S. at 324, 113 S.Ct. at 2645, 125 L.Ed.2d at 273. Because we think that a tax on tobacco products distributors is not "wholly irrelevant" to the objective of providing long-term health care for the poor, we find that the statute does not violate due process.
Plaintiff's next argument is that by imposing a tax on tobacco products distributors specifically to fund nursing home care for the poor, the Act violates the second prong on the Illinois uniformity test. Section 2 of Article IX of the Illinois Constitution provides:
"In any law classifying the subjects or objects of non-property taxes or fees, the classes shall be reasonable and the subjects or objects within each class shall be taxed uniformly. Exemptions, deductions, credits, refunds, or other allowances shall be reasonable." Ill. Const. 1970, art. IX, § 2.
The supreme court has held that "[t]o survive scrutiny under the uniformity clause, a non-property tax classification must (1) be based on a real and substantial difference between the people taxed and those not taxed, and (2) bear some reasonable relationship to the object of the legislation or to public policy." Milwaukee Safeguard Insurance Co. v. Selcke, 179 Ill.2d 94, 98, 227 Ill.Dec. 731, 688 N.E.2d 68 (1997).
Plaintiff notes that the uniformity clause "was not made to duplicate the limitation on the taxing power contained in the equal protection clause." Searle Pharmaceuticals, Inc. v. Department of Revenue, 117 Ill.2d 454, 467, 111 Ill.Dec. 603, 512 N.E.2d 1240 (1987). Rather, "the uniformity clause was meant to insure that 'taxpayers * * * receive added protection in the state constitution' based on `standards of reasonableness which are more rigorous than those developed under the federal constitution.' " Milwaukee Safeguard, 179 Ill.2d at 102, 227 Ill.Dec. 731, 688 N.E.2d 68, quoting 7 Record of Proceedings, Sixth Illinois Constitutional Convention 2062, 2074 (Report of the Committee on Revenue and Finance, Section1State Revenue Power). Only the second of these two requirements is involved here. See, e.g., Primeco Personal Communications, L.P. v. Illinois Commerce Comm'n, 196 Ill.2d 70, 84, 255 Ill.Dec. 621, 750 N.E.2d 202 (2001) (considering uniformity challenge based on the "second prong" of the test). Under that second prong, a court first determines "the object (or purpose) of the taxing provision at issue." (Emphasis omitted.) Primeco, 196 Ill.2d at 85, 255 Ill.Dec. 621, 750 N.E.2d 202. The court then determines "whether that object is reasonably related to the class of entities taxed." Primeco, 196 Ill.2d at 85, 255 Ill.Dec. 621, 750 N.E.2d 202.
The "more rigorous" standard to which Milwaukee Safeguard alludes is actually a burden-shifting arrangement under which a party bringing a uniformity clause challenge need not negate every conceivable basis that might support the tax. Searle, 117 Ill.2d at 468, 111 Ill.Dec. 603, 512 N.E.2d 1240. Instead, a good-faith challenge to a tax classification requires the taxing body to justify the classification. Primeco, 196 Ill.2d at 85, 255 Ill.Dec. 621, 750 N.E.2d 202. The challenger must then "persuade the court that the taxing body's justification is unsupported by the facts or insufficient as a matter of law." Primeco, 196 Ill.2d at 85, *406 255 Ill.Dec. 621, 750 N.E.2d 202. If the former, the challenger must "present a factual basis negating the asserted justification." Allegro Services, Ltd. v. Metropolitan Pier & Exposition Authority, 172 Ill.2d 243, 256, 216 Ill.Dec. 689, 665 N.E.2d 1246 (1996).
Despite the "more rigorous" standard, however, the scope of the court's inquiry "remains relatively narrow." Allegro, 172 Ill.2d at 250, 216 Ill.Dec. 689, 665 N.E.2d 1246. As the supreme court has held, the uniformity clause "was not designed as a straitjacket for the General Assembly" but was meant only to "enforce minimum standards of reasonableness and fairness between groups of taxpayers." Geja's Cafe v. Metropolitan Pier & Exposition Authority, 153 Ill.2d 239, 252, 180 Ill.Dec. 135, 606 N.E.2d 1212 (1992). It is not a "precise formula for drawing tax lines" (Allegro, 172 Ill.2d at 253, 216 Ill. Dec. 689, 665 N.E.2d 1246), nor is it a license for courts or litigants to claim "they can draw better taxing lines than the General Assembly" (Geja's Cafe, 153 Ill.2d at 252, 180 Ill.Dec. 135, 606 N.E.2d 1212).
Plaintiff begins by arguing that by "selectively imposing a tax on certain tobacco distributors for the sole purpose of funding a general welfare program of the state, the Act is both arbitrary and unreasonably limited in relation to its legislative purpose." It asserts that the simple fact that the tax singles out cigar and chewing tobacco distributors for taxation expressly to fund nursing home care for the poor, by itself, establishes that the tax classification does not bear a reasonable relationship to the object of the legislation or to public policy. Again, for this, it cites Crocker, 99 Ill.2d at 457, 77 Ill.Dec. 97, 459 N.E.2d 1346.
Unlike its due process argument, however, it then points to the evidence it introduced at trial to show that there is no "causal link of a relationship, casual or otherwise, between the use of these Tobacco Products and the reasons why persons become residents of nursing homes." Moreover, it claims that "[t]he Defendants also admit that they have no evidence of a causal link or relationship between the use of these Tobacco Products and the primary medical maladies suffered by residents of nursing homes," and that defendants "have not found any studies directly linking the use of such Tobacco Products to the reasons why persons become residents of nursing homes." And with regard to the evidence that defendants did produce at trial, plaintiff claims that such assertions "miss the point." It argues, "[t]he issue in this case is not whether the use of cigars and chewing tobacco could possibly cause illness in the very small percentage of people who chronically use such products, but whether there is a sufficient relationship between the use of cigars and chewing tobacco and nursing home admissions to justify taxing these products to the exclusion of others." See Milwaukee Safeguard, 179 Ill.2d at 102, 227 Ill.Dec. 731, 688 N.E.2d 68.
Alternatively, it assertsas it did in its due process argumentthat even if there was some relationship between the tobacco products and this general welfare program, the fact that it is a general welfare program open to all (and not just users of cigars and chewing tobacco) demonstrates that such a relationship is insufficient as a matter of law to justify such a classification under the uniformity clause. Again, for this, it cites Crocker, 99 Ill.2d at 457, 77 Ill.Dec. 97, 459 N.E.2d 1346, for its holding that a tax on a narrow group of taxpayers to fund a general welfare program of the state was unreasonable and arbitrary in violation of both the Illinois due process and uniformity clauses. In fact, plaintiff concludes that in such situations, taxes *407 aimed at specific groups should receive more scrutiny under the uniformity clause, and that to satisfy uniformity, "the selected taxpayer class must be the sole or primary beneficiary of the object of the tax."
Initially, it appears that Arangold's uniformity clause argument overlaps its due process argument. However, we are not persuaded by plaintiff's transposed argument for three reasons. First, plaintiff cites to no cases that have held that certain types of taxes challenged on uniformity grounds should receive "more scrutiny" than others. Indeed, nowhere in Crocker does the court hold that some taxes are subject to greater scrutiny under the uniformity clause. On the contrary, the court cited the uniformity clause only to indicate that it did not matter for purposes of the case whether the court considered the statute as an exercise of the State's policing power or its taxing power. Crocker, 99 Ill.2d at 457, 77 Ill.Dec. 97, 459 N.E.2d 1346. The court commented only that tax classifications "must be reasonable" and never indicated a higher standard.
Second, as defendant notes, the uniformity clause imposes no blanket prohibition on taxing a narrow group to fund a program for a larger group. Again, relying only on Crocker, Arangold argues that it does, and even goes so far as to say that Carmichael is no longer good law. As discussed above, Crocker never reaches that conclusion even as to the due process clause, and plaintiff cites to no cases that suggest otherwise or that Carmichael was wrongly decided.
Third, the uniformity clause in no way requires the class taxed to be the "sole or primary beneficiary" of the tax. Rather, courts have held that uniformity is satisfied even when those taxed benefit only indirectly (Allegro, 172 Ill.2d at 258, 216 Ill.Dec. 689, 665 N.E.2d 1246), or when others not taxed benefit as well. See Terry v. Metropolitan Pier & Exposition Authority, 271 Ill.App.3d 446, 454, 208 Ill. Dec. 125, 648 N.E.2d 1047 (1995). Crocker, we note, did not reach this conclusion about the uniformity clause, partially because the case was not about uniformity, but mainly because it did not even reach that conclusion even with respect to due process. Crocker, 99 Ill.2d at 456-57, 77 Ill.Dec. 97, 459 N.E.2d 1346.
Instead, to satisfy uniformity, the tax under the Act only needs to bear "some reasonable relationship" to the Act's object, and is not per se invalid because it taxes a "narrow group of tobacco distributors" to fund a "general welfare program." As stated above, once Arangold made its uniformity challenge, it was only necessary for the defendants to suggest a "conceivable" relationship between the tax and the purpose of the Act. Allegro, 172 Ill.2d at 251, 216 Ill.Dec. 689, 665 N.E.2d 1246. As defendants note, the purpose of the Act is evident from the Act itself, which allocates tax revenues to the Long-Term Care Provider Fund which, in turn, is used to provide care for the poor in skilled or intermediate nursing facilities. Accordingly, the Act taxes tobacco distributors because their products cause diseases that require people to need long term care for which they cannot pay.
However, Arangold then did not meet its burden of "present[ing] a factual basis negating the asserted justification." Allegro, 172 Ill.2d at 256, 216 Ill.Dec. 689, 665 N.E.2d 1246. Instead, as Arangold conceded in its summary judgment brief in the circuit court, it is undisputed that the tobacco products taxed under the Act can cause a variety of serious and debilitating diseases, including heart disease, lung disease, and cancer. Moreover, according to the National Nursing Home Survey, which *408 was submitted by the plaintiff, a large amount of people admitted to long-term care are admitted to facilities because they have these diseases. Specifically, 30% of all persons admitted were diagnosed with diseases of the circulatory system, respiratory disease, or cancer.
Given these facts, we find that the General Assembly could fairly find a connection between tobacco products and long-term care for the poor. It was not unreasonable for the General Assembly to make distributors of tobacco products bear a portion of the cost that the state incurs in providing that careespecially when the portion is only about 2% to 3% of the total. And because Arangold failed to meet its burden, defendants are entitled to judgment as a matter of law.
Mindful that neither the due process nor uniformity clause requires "perfect rationality" as to each taxpayer (see, e.g., People v. P.H., 145 Ill.2d 209, 232, 164 Ill.Dec. 137, 582 N.E.2d 700 (1991) (due process); Geja's Cafe, 153 Ill.2d at 252,180 Ill.Dec. 135, 606 N.E.2d 1212 (uniformity)), plaintiffs argument that the Act only represents a half-measure is unpersuasive. Indeed, the General Assembly can decide to "approach a perceived problem incrementally" and can "`select one phase of one field and apply a remedy there, neglecting the others.' [Citation.]" Beach, 508 U.S. at 316, 113 S.Ct. at 2102, 124 L.Ed.2d at 223. It need not "`pass one law meeting every exigency, but may consider degrees of evil.' [Citation.]" Cutinello, 161 Ill.2d at 422, 204 Ill.Dec. 136, 641 N.E.2d 360. Because we find that defendants have succeeded in presenting a rational relationship between the tax and its objects and because plaintiff has not been able to refute that justificationwith respect to its uniformity clause challengewe hold that the circuit court correctly upheld the constitutionality of the Act in all respects and correctly granted summary judgment to the defendants.
Affirmed.
CAMPBELL, P.J., and REID, J., concur.
NOTES
[1] As discussed below, agood-faith uniformity clause challenge to a tax classification requires the taxing body to justify the classification. The plaintiff may then attempt to persuade the court that the taxing body's justification is unsupported by the facts by presenting a factual basis negating the asserted justification. Allegro Service, Ltd. v. Metropolitan Pier & Exposition Authority, 172 Ill.2d 243, 256, 216 Ill.Dec. 689, 665 N.E.2d 1246 (1996). These facts, however, have no bearing on the plaintiff's due process argument.
[2] We note that this is the second part of the two-prong "rational basis test." The first part of the test requires tha the claissification be based on real and rational differences between the persons taxed and those not taxed. Plaintiff addresses only the second prong of this argument.