No. 2-09-1136     Filed: 11-1-10

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| MICHAEL A. RAJTEROWSKI, ROBERT SKELTON, LYNN SKELTON, MICHELLE ELIASON, JEFFREY ELIASON, PAUL BRIAN HUDON, and ANDREA LEE HUDON, | ) ) ) ) ) ) | Appeal from the Circuit Court of De Kalb County. |
| Plaintiffs-Appellants, | ) ) | |
| v. | ) ) | No. 08--CH--271 |
| THE CITY OF SYCAMORE and SYCAMORE COMMUNITY UNIT SCHOOL DISTRICT No. 427, | ) ) ) ) | Honorable Kurt P. Klein, |
| Defendants-Appellees. | ) ) | Judge, Presiding. |

JUSTICE JORGENSEN delivered the opinion of the court:

In an amended five-count complaint, plaintiffs, Michael A. Rajterowski, Robert and Lynn Skelton, Michelle and Jeffrey Eliason, and Paul Brian and Andrea Lee Hudon, sued defendants, the City of Sycamore (City) and Sycamore Community Unit School District No. 427 (School District), arguing that the City's real estate transfer tax, from which buyers of homestead real estate who had resided in the City for at least one year were exempt, violated the federal and state constitutions and that, in entering into an intergovernmental agreement under which the City forwarded transfer tax revenues to the School District, the City and the School District exceeded their constitutional and statutory authority. Defendants moved to dismiss plaintiffs' complaint, asserting that it failed to state

a cause of action.  735 ILCS 5/2--615 (West 2008).  The trial court granted defendants' motion as to all counts and dismissed plaintiffs' complaint with prejudice.  Plaintiffs appeal.  We affirm.

## I.  BACKGROUND

On March 21, 2006, a referendum was passed, authorizing the City, a home rule municipality, to impose a municipal transfer tax on real property transferred within its boundaries (Transfer Tax). On April 17, 2006, the City adopted Ordinance No. 2005.93 (Ordinance), which established the Transfer Tax.  The Ordinance became effective on June 1, 2006, and imposed on the transfer of title to real estate located in the City a tax at a rate of $5 for each $1,000 of value or fraction thereof.

The Ordinance was intended by the City to create a new source of funds that it would give to the School District, a public school district, to supplement the School District's operating revenue. The mechanism by which the City provides the funds to the School District is an intergovernmental agreement (Intergovernmental Agreement) executed pursuant to the Illinois Intergovernmental Cooperation Act (5 ILCS 220/1 et seq. (West 2008)).  The agreement provided that certain start-up and ongoing operating expenses the City incurred that were related to the Transfer Tax would be withheld from the revenues generated by the tax.  There would also be a cooperatively established method to account for the monies received from the Transfer Tax and distributed to the School District.

The Ordinance contains an exemption, which is at issue in this appeal, for buyers of homestead real estate within the City who have been residents of the City for at least one year:

"1.  The following deeds shall be exempt from the tax levied by this Article:

* * *

-2-

(n) A deed or trust document where the grantee or buyer is purchasing homestead real estate within the [C]ity and has maintained resident status (whether as a tenant or as an owner-occupier of real property) within the corporate limits of the City *** for a period of at least one year immediately prior to the date of application for exemption from the transfer tax to be imposed." Sycamore Municipal Code §3--20--6 (2006).

Rajterowski formerly lived one-quarter mile outside the City's limits and purchased a home in the City in July 2006. Robert and Lynn Skelton formerly lived in Edwardsville and purchased a home in the City in October 2006. Michelle and Jeffrey Eliason formerly resided in Texas and purchased a home in the City in June 2006. Paul and Andrea Hudon formerly resided in Florida and purchased a home in the City in August 2006. Because plaintiffs had not been residents of the City for one year immediately prior to purchasing homestead property in the City, they did not qualify for the Transfer Tax exemption. Plaintiffs paid the Transfer Tax.[1]

On July 10, 2008, plaintiffs sued the City and the School District. In a five-count complaint, plaintiffs alleged that the Transfer Tax violates the United States and Illinois Constitutions and that, in entering into the Intergovernmental Agreement, the City and the School District exceeded their authority. Specifically, plaintiffs alleged that: (1) the Ordinance violates the privileges and immunities clause of article IV, section 2, of the United States Constitution (U.S. Const., art. IV, §2) (count I); (2) the Ordinance violates the equal protection clause of the United States Constitution (U.S. Const, amend. XIV) (count II); (3) the Ordinance violates the uniformity clause of the Illinois Constitution (Ill. Const. 1970, art. IX, §2) (count III); (4) in enacting the Ordinance and entering into

---

[1]Rajterowski paid $1,915; the Skeltons paid $2,395; the Eliasons paid $2,425; and the Hudons paid $2,020.

the Intergovernmental Agreement, the City exceeded its authority under the Illinois Constitution (count IV); and (5) in entering into the Intergovernmental Agreement, the School District exceeded its authority under the Illinois Constitution (count V).

On September 2, 2008, defendants moved to dismiss plaintiffs' complaint (735 ILCS 5/2--615 (West 2008)), alleging that it failed to state any cause of action. On November 25, 2008, the court held a hearing on the motion. On January 13, 2009, the court granted the motion, finding that plaintiffs' complaint failed to state a cause of action as to all counts. The court granted plaintiffs leave to file an amended complaint.

On February 10, 2009, plaintiffs filed an amended 26-page, 5-count complaint. Thereafter, on March 12, 2009, defendants moved to strike and dismiss the amended complaint. On April 17, 2009, defendants moved for sanctions (155 Ill. 2d R. 137), arguing that plaintiffs' amended complaint contained no substantive changes from the initial complaint and, therefore, was an improper attempt to relitigate claims already decided by the trial court. A hearing on the motion to dismiss was held on August 20, 2009. On October 15, 2009, the trial court granted defendants' motion and dismissed plaintiffs' complaint with prejudice. Also, the court denied defendants' motion for sanctions, finding that sanctions were "not appropriate in this matter." Plaintiffs appeal.

## II. STANDARD OF REVIEW

A motion to dismiss pursuant to section 2--615 of the Code of Civil Procedure (735 ILCS 5/2--615 (West 2008)) challenges only the complaint's legal sufficiency. Napleton v. Village of Hinsdale, 229 Ill. 2d 296, 305 (2008); DeWoskin v. Loew's Chicago Cinema, Inc., 306 Ill. App. 3d 504, 513 (1999) (legal sufficiency of complaint alleging constitutional violations may be raised by section 2--615 motion). The motion does not raise affirmative factual defenses. DeWoskin, 306 Ill.

App. 3d at 514. In ruling on a section 2--615 motion to dismiss, a court should inquire whether the allegations of the complaint, when accepted as true and considered in the light most favorable to the plaintiff, are sufficient to state a cause of action upon which relief may be granted. Turner v. Memorial Medical Center, 233 Ill. 2d 494, 499 (2009). "Evidentiary material outside of the complaint may not be considered." DeWoskin, 306 Ill. App. 3d at 514. Since Illinois is a fact-pleading jurisdiction, "a plaintiff must allege facts sufficient to bring his or her claim within the scope of the cause of action asserted." Turner, 233 Ill. 2d at 499. A plaintiff need not prove his or her case at the pleading stage; however, he or she must allege specific facts supporting each element of the cause of action, and "the court will not admit conclusions of law and conclusory allegations not supported by specific facts." Visvardis v. Eric P. Ferleger, P.C., 375 Ill. App. 3d 719, 724 (2007). A complaint should not be dismissed under section 2--615 unless no set of facts can be proved that would entitle the plaintiff to recover. Napleton, 229 Ill. 2d at 305. We review de novo the trial court's dismissal of a complaint under section 2--615. Kelley v. Carbone, 361 Ill. App. 3d 477, 480 (2005).

### III. ANALYSIS

Home rule municipalities, such as the City, have the right to levy taxes. Ill. Const. 1970, art. VII, §6(a). They may exercise their taxation powers, unless restricted by the constitution or appropriate legislation. Mulligan v. Dunne, 61 Ill. 2d 544, 550 (1975). A transfer tax in and of itself does not "offend any constitutional provisions." Stahl v. Village of Hoffman Estates, 296 Ill. App. 3d 550, 554 (1998); see also 65 ILCS 5/8--3--19 (West 2006) (authorizing home rule municipalities to impose, upon prior approval by referendum, real estate transfer taxes). Indeed, the central issue

in this case is whether plaintiffs' complaint stated a cause of action that the exemption violates certain constitutional or statutory provisions.

A. Count I--Privileges and Immunities Clause of Article IV of the Federal Constitution

The privileges and immunities clause provides that: "The Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States." U.S. Const., art. IV, §2, cl. 1. It "was designed 'to place the citizens of each State upon the same footing with citizens of other States, so far as the advantages resulting from citizenship in those States are concerned.' " United Building & Construction Trades Council v. Mayor & Council of the City of Camden, 465 U.S. 208, 215-16, 79 L. Ed. 2d 249, 257, 104 S. Ct. 1020, 1026 (1984), quoting Paul v. Virginia, 75 U.S. (8 Wall.) 168, 180, 19 L. Ed. 357, 360 (1868); see also Broeckl v. Chicago Park District, 131 Ill. 2d 79, 88 (1989) ("clause prohibits one State from discriminating against citizens of another State" and "does not apply where a city or municipal ordinance discriminates against intrastate residents" (emphasis added). Although the clause is written in terms of state citizenship guarantees, it also applies to residency or citizenship restrictions established by municipalities. United Building & Construction Trades Council, 465 U.S. at 215, 79 L. Ed. 2d at 256, 104 S. Ct. at 1026. Further, merely because an ordinance disadvantages some in-state residents does not immunize the ordinance from constitutional review. United Building & Construction Trades Council, 465 U.S. at 215, 79 L. Ed. 2d at 256, 104 S. Ct. at 1026.

In count I of their amended complaint, the Eliasons and the Hudons (the plaintiffs who moved to the City from out of state) sought declaratory, injunctive, and other relief. They alleged that they were wrongly denied the privileges and immunities guaranteed under the federal constitution because, as to application of the exemption, there was no rational basis or substantial

reason for the differential treatment between City residents and nonresidents. The Eliasons and the Hudons noted that, in passing the Ordinance, the City sought to increase funding for the School District. They alleged that lack of adequate school funding, to the extent it exists, is not caused by resident citizens of foreign states moving into the City and purchasing real estate; thus, there is no substantial reason or rational basis for the discrimination between resident citizens of a foreign state and resident citizens of the City. They further alleged that buyers who are residents of foreign states can never qualify or be eligible for the Transfer Tax exemption. For the following reasons, we conclude that the trial court did not err in dismissing count I.

To assess whether plaintiffs pleaded a cause of action based upon a violation of the privileges and immunities clause, we briefly review the requirements for showing such a violation. When a law establishes a citizenship or residency classification, a court applies a two-part test in assessing whether the law violates the privileges and immunities clause. First, the court determines whether the benefit or activity constitutes one of the "privileges and immunities" protected by the clause. United Building & Construction Trades Council, 465 U.S. at 218, 79 L. Ed. 2d at 258, 104 S. Ct. at 1027. Second, the court determines if there is a substantial state interest in the difference in treatment of nonresidents. United Building & Construction Trades Council, 465 U.S. at 222, 79 L. Ed. 2d at 261, 104 S. Ct. at 1029.

As to the first part of the test, the Supreme Court has noted that states must treat residents and nonresidents "without unnecessary distinctions" when the nonresident seeks to "engage in an essential activity or exercise a basic right." Baldwin v. Fish & Game Comm'n, 436 U.S. 371, 387, 56 L. Ed. 2d 354, 367, 98 S. Ct. 1852, 1862 (1978). However, if the nonresident engages in conduct that is not "fundamental" because it does not "bea[r] upon the vitality of the Nation as a single

entity," the privileges and immunities clause affords no protection. Baldwin, 436 U.S. at 383, 56 L. Ed. 2d at 365, 98 S. Ct. at 1860. The determination:

"whether a right is sufficiently fundamental to be protected by the [privileges and immunities] clause should not be confused with a determination of whether an activity constitutes a fundamental right so as to require strict judicial scrutiny under the due process and equal protection clauses when the activity is regulated by the government. For example, the regulation of conditions of employment is not considered a limitation of a fundamental right for due process and equal protection analysis, but the ability to engage in private sector activity or employment is a fundamental right protected by the privileges and immunities clause." (Emphases added.) 2 R. Rotunda & J. Nowak, Constitutional Law §12.7(d)(ii), at 335-36 (4th ed. 2007).

Along with private-sector employment, access to the courts and the disposition of privately held property have been held to be fundamental rights for privileges and immunities clause analysis (see Baldwin, 436 U.S. at 383, 56 L. Ed. 2d at 365, 98 S. Ct. at 1860), as has the right to procure medical services (Doe v. Bolton, 410 U.S. 179, 200, 35 L. Ed. 2d 201, 217, 93 S. Ct. 739, 751 (1973)). However, recreational activities, such as recreational hunting or fishing, are not considered privileges or immunities. Baldwin, 436 U.S. at 388, 56 L. Ed. 2d at 368, 98 S. Ct. at 1863; Toomer v. Witsell, 334 U.S. 385, 403, 92 L. Ed. 1460, 1475, 68 S. Ct. 1156, 1165 (1948). Likewise, suffrage and qualification for elective office may be tied to an individual's identification with a specific state and are, therefore, not protected by the privileges and immunities clause. See Baldwin, 436 U.S. at 383, 56 L. Ed. 2d at 365, 98 S. Ct. at 1860.

On appeal, plaintiffs argue that their complaint sufficiently pleaded that the rights to travel and purchase property are fundamental rights protected by the privileges and immunities clause. Preliminarily, we note that there is some support for the proposition that the rights to travel and purchase property are considered privileges and immunities. See Saenz v. Roe, 526 U.S. 489, 500-01, 143 L. Ed. 2d 689, 702, 119 S. Ct. 1518, 1525 (1999) (discussing the three aspects of the right to travel and noting that the privileges and immunities clause of article IV protects citizens of one state who travel to another state, intending to return home at the end of their journey);[2] Ward v. Maryland, 79 U.S. (12 Wall.) 418, 430, 20 L. Ed. 449, 452 (1871) (the clause "plainly and unmistakably secures and protects the right of a citizen of one State to pass into any other State of

---

[2]A second aspect of the right to travel is a newly arrived citizen's right to the same privileges and immunities enjoyed by other citizens of the same state. This right is identified in the privileges and immunities clause of the fourteenth amendment. Saenz, 526 U.S. at 502-03, 143 L. Ed. 2d at 703-04, 119 S. Ct. at 1526. A third aspect of the right to travel, which has no specific textual source in the constitution, protects the right of a citizen of one state to enter and leave another state. Saenz, 526 U.S. at 500-01, 143 L. Ed. 2d at 702, 119 S. Ct. at 1525. The right to travel is not explicitly mentioned in the federal constitution, and Saenz is the only Supreme Court case to enunciate three aspects of the right to travel. Further, the right to travel has, in various cases, been held to be grounded upon the privileges and immunities clause of article IV, the privileges and immunities clause of the fourteenth amendment, or the commerce clause, or it has been generally considered as a basic right under the federal constitution. Shapiro v. Thompson, 394 U.S. 618, 630 n.8, 22 L. Ed. 2d 600, 612 n.8, 89 S. Ct. 1322, 1329 n.8 (1969) (citing cases), overruled on other grounds by Edelman v. Jordan, 415 U.S. 651, 39 L. Ed. 2d 662, 94 S. Ct. 1347 (1974).

the Union for the purpose of engaging in lawful commerce, trade, or business, without molestation; to acquire personal property; to take and hold real estate; to maintain actions in the courts of the State; and to be exempt from any higher taxes or excises than are imposed by the State upon its own citizens" (emphasis added)); see also Borden v. Selden, 259 Iowa 808, 819, 146 N.W.2d 306, 314 (1966) (statute denying nonresident Iowa landowners a land tax credit that was granted to resident owners held unconstitutional as violating the privileges and immunities clause); Opinion of the Judges, 81 S.D. 629, 632, 140 N.W.2d 34, 35 (1966) (advisory opinion holding that property tax relief act that granted to South Dakota residents a real estate tax refund not allowed to nonresidents was unconstitutional as violating privileges and immunities clause). Assuming that the foregoing rights are fundamental for purposes of the privileges and immunities clause, we conclude that plaintiffs' complaint has failed to sufficiently plead a violation of the clause.

In count I, plaintiffs alleged that, along with laws passed by states, the privileges and immunities clause applies to an ordinance that discriminates on the basis of municipal residency. Nowhere in count I of the complaint did plaintiffs specifically mention the rights to travel and purchase property. Nevertheless, we infer these rights from the allegations referencing "discrimination [in application of the Transfer Tax exemption] between resident citizens of a foreign state and resident citizens of" the City.

Having determined that plaintiffs, via their references to the differential treatment of residents and nonresidents, adequately pleaded that the rights to travel and purchase property are privileges and immunities, we conclude that their complaint failed to plead sufficient facts as to the second part of our inquiry. This analysis, i.e., whether there is a substantial state interest in the difference in treatment of nonresidents, consists of two aspects: (1) there must be a substantial reason for the

discrimination beyond the fact that they are citizens of other states; that is, there must be something to indicate that noncitizens constitute a "peculiar source of evil" at which the statute or ordinance is directed; and (2) the court must find a substantial or reasonable relationship between the evil and the discrimination practiced against noncitizens. Hicklin v. Orbeck, 437 U.S. 518, 525-27, 57 L. Ed. 2d 397, 404-05, 98 S. Ct. 2482, 2487-88 (1978); People ex rel. Bernardi v. Leary Construction Co., 102 Ill. 2d 295, 299 (1984).

Plaintiffs argue that the "evil" at which the Ordinance is directed is inadequate school funding. Indeed, in their amended complaint, plaintiffs alleged that the Ordinance was intended "to create a new source of funds that [the City] will give to the School District to supplement the School District's operating revenues," and plaintiffs attached thereto a copy of the Intergovernmental Agreement. The question, plaintiffs assert, is whether nonresidents are the source of the evil. In their complaint, they alleged that there "is no substantial reason, nor rational basis for discriminating between citizens of a foreign state and citizens of [the City], when establishing a transfer tax to increase school funding." The complaint continued, "Lack of adequate school funding, if indeed there is a lack of funding, is not caused by resident citizens of a foreign state moving into [the City] and purchasing real estate, thus, there is no 'substantial reason' nor 'rational basis' for the discrimination between resident citizens of a foreign state and resident citizens of" the City.

The foregoing allegations are clearly conclusory. To survive a section 2--615 motion to dismiss, a plaintiff must allege specific facts supporting each element of the cause of action, and we will "not admit conclusions of law and conclusory allegations not supported by specific facts." Visvardis, 375 Ill. App. 3d at 724. The foregoing allegations mirror the "elements" of the second aspect of our analysis, i.e., substantial reason and substantial relationship, but do not constitute

specific factual allegations. Nowhere in count I of their amended complaint did plaintiffs provide any factual allegations supporting their conclusion that residents of a foreign state, such as the Eliasons and the Hudons, who move to the City and purchase real estate do not cause inadequate school funding. In their appellate brief, plaintiffs state that the City "is discriminating against nonresidents who <u>may</u> only be a small part of the cause/source of increased costs in the School District." (Emphasis added.) They continue, the "facts <u>could</u> show that the majority of the increased School District costs result from an increase of the school population coming mainly from children born to established residents, from costs of salary increases to existing teachers, or from increased administration or energy costs that are unrelated to an overwhelming mass (if there is one) of new students coming from parents who moved" to the City from outside it. (Emphasis added.) We agree with plaintiffs that the facts could show any of the foregoing sources of the underfunding, but this does not absolve them of their obligation to plead specific facts to state a claim for relief. Because count I of the amended complaint contained, as to the elements of a privileges and immunities clause claim, merely conclusory allegations unsupported by specific facts, we conclude that, as to count I, the trial court did not err in granting defendants' motion to dismiss.

### B. Count II--Equal Protection Clause of the Federal Constitution

In count II of their amended complaint, plaintiffs alleged that the Ordinance violates the equal protection clause of the fourteenth amendment, which provides that the states may not " 'deny to any person within [their] jurisdiction the equal protection of the laws,' " but does allow reasonable classifications among such persons. <u>Western & Southern Life Insurance Co. v. State Board of Equalization of California</u>, 451 U.S. 648, 656-57, 68 L. Ed. 2d 514, 523, 101 S. Ct. 2070, 2077 (1981), quoting U.S. Const., amend. XIV, §1. They asserted that the Ordinance, by treating plaintiffs

disparately from City residents purchasing homestead property, denies them equal protection of the laws.

In this count, unlike in count I, plaintiffs specifically alleged that the right to own property is a fundamental right and that the exemption (i.e., the discrimination), based upon a buyer's residence prior to purchasing real estate in the City, has neither a rational basis nor is narrowly tailored to the reason the City adopted the Transfer Tax (i.e., to address school underfunding). Plaintiffs noted that the City's and the School District's boundaries are not coterminous. The Ordinance, they alleged, violates the equal protection clause by making unconstitutional distinctions among several classifications of buyers: (1) resident and nonresident buyers of real estate; (2) homestead and nonhomestead resident buyers of real estate; (3) persons living within the School District but outside the City who buy homestead property within the City; and (4) persons living in (or moving to) the City who buy homestead or nonhomestead real estate within the City but outside the School District. Plaintiffs asserted that there is no real and substantial difference among the classes of purchasers.

As to Ratjerowski, plaintiffs alleged that he was wrongly denied equal protection because, prior to purchasing real estate in the City, he already lived in the School District. In plaintiffs' view, after Ratjerowski moved into the City, he did not cause any additional burden to the School District.[3]

---

[3]Plaintiffs also alleged (generally and not as to any specific plaintiff in this case) that parts of the City do not lie within the School District; rather, they lie in a neighboring district. Plaintiffs alleged that purchasers moving into portions of the City that are not within the School District must pay the tax even though their children will attend school in another school district.

As to the Skeltons, Eliasons, and Hudons (who lived outside the City and the School District), plaintiffs alleged that there is no rational basis for the disparate treatment of residents and nonresidents. These plaintiffs paid the Transfer Tax that a City resident of more than one year does not have to pay and, therefore, were denied the equal protection of the laws.

Additionally, plaintiffs alleged that the exemption is unconstitutional as it applies to resident, nonhomestead purchasers, including corporations, partnerships, or individuals purchasing commercial property. In plaintiffs' view, a resident corporation or individual purchasing a building for office space places no additional financial burden on the School District and is, therefore, no different from a resident homestead buyer when one considers the City's only reason for the Ordinance.

The first step in assessing an equal protection claim is to determine if the enactment at issue disadvantages a suspect class or infringes upon a fundamental right. Fundamental rights include the expression of ideas, participation in the political process, and intimate personal privacy interests. People ex rel. Tucker v. Kotsos, 68 Ill. 2d 88, 97 (1977). Where the enactment creates a suspect classification or infringes upon a fundamental right, then, under what is called strict-scrutiny review, the enactment must promote a compelling or overriding state interest. Illinois Housing Development Authority v. Van Meter, 82 Ill. 2d 116, 119-20 (1980). Further, the enactment must be narrowly tailored thereto, i.e., the legislature must use the least restrictive means consistent with the attainment of its goal. Schultz v. Lakewood Electric Corp., 362 Ill. App. 3d 716, 720 (2005). Intermediate scrutiny applies to an ordinance that is based on a gender or illegitimacy classification or that causes certain incidental burdens to speech. In re Detention of Samuelson, 189 Ill. 2d 548, 561-62 (2000); Desnick v. Department of Professional Regulation, 171 Ill. 2d 510, 521 (1996). In all other

circumstances, courts will review an ordinance under highly deferential rational-basis scrutiny. Samuelson, 189 Ill. 2d at 562. Under the rational-basis test, the enactment must bear a rational relationship to a legitimate governmental interest. Van Meter, 82 Ill. 2d at 120.

On appeal, plaintiffs argue that they stated an equal protection claim. They assert that the rights to travel and own property are fundamental rights requiring strict-scrutiny analysis. In their complaint, plaintiffs alleged that the equal protection clause prevents a municipality from discriminating on the basis of residency, without a proper basis for that discrimination. They also specifically alleged that the right to own property is a fundamental right. Alternatively, they argue that, if the foregoing are not fundamental rights, the Ordinance does not survive rational-basis review.

Turning first to property, we reject plaintiffs' assertion that the right to private housing, in and of itself, is a fundamental right. See, e.g., Van Meter, 82 Ill. 2d at 121 (the Supreme Court "has clearly ruled that a right to private housing is not a fundamental right" and, thus, applies rational-basis review "to government actions that might burden a person's ability to find adequate housing"), citing Village of Belle Terre v. Boraas, 416 U.S. 1, 7-9, 39 L. Ed. 2d 797, 803-04, 94 S. Ct. 1536, 1540-41 (1974) (upholding a village zoning ordinance that limited, with certain exceptions, the occupancy of one-family dwellings to traditional families or to groups of not more than two unrelated persons after determining that no fundamental right guaranteed by the federal constitution was involved and, thus, applying rational-basis scrutiny), and Lindsey v. Normet, 405 U.S. 56, 74, 31 L. Ed. 2d 36, 51, 92 S. Ct. 862, 874 (1972) ("We are unable to perceive in [the federal constitution] any constitutional guarantee of access to dwellings of a particular quality, or any recognition of the right of a tenant to occupy the real property of his landlord beyond the term of his

lease without the payment of rent or otherwise contrary to the terms of the relevant agreement"); see also 4 R. Rotunda & J. Nowak, Constitutional Law §18.44, at 411 (4th ed. 2008) ("the Court has not subjected governmental actions which might burden persons' abilities to find adequate private housing to any standard of review above the rationality test of the due process and equal protection guarantees. Of course, if these laws involve the use of suspect classifications or burden fundamental rights they will be subjected to the strict scrutiny standard of review").

As to the right to travel, count II of plaintiffs' complaint did not explicitly mention the right. Rather, they alleged that basing applicability of the exemption on a buyer's residency prior to purchasing real estate in the City was unconstitutional because it impermissibly distinguished between, inter alia, nonresident (including out-of-state) and resident buyers. We conclude that the assertion that the discrimination against out-of-state residents implicates the right to travel can be reasonably inferred from the complaint's allegations.

Having determined that plaintiffs adequately pleaded that the Ordinance affects the right to travel, we next address the proper level of scrutiny. Plaintiffs urge that, as to the right to travel, strict scrutiny applies, and defendants respond that rational-basis review is appropriate. Case law is not directly on point.

For example, laws that establish durational residency requirements for certain governmental benefits are subject to strict-scrutiny review. See, e.g., Shapiro v. Thompson, 394 U.S. 618, 634, 22 L. Ed. 2d 600, 615, 89 S. Ct. 1322, 1331 (1969) (applying strict-scrutiny review and holding invalid as a restriction on the fundamental right to travel a one-year residency requirement for subsistence welfare benefits), overruled on other grounds by Edelman v. Jordan, 415 U.S. 651, 39 L. Ed. 2d 662, 94 S. Ct. 1347 (1974); see also Memorial Hospital v. Maricopa County, 415 U.S. 250, 259, 39 L.

Ed. 2d 306, 315, 94 S. Ct. 1076, 1082-83 (1974) (Court, applying strict-scrutiny review, struck down Arizona statute that required one-year residency in a county as a condition of receiving nonemergency hospitalization or medical care at county's expense; "medical care is as much 'a basic necessity of life' to an indigent as welfare assistance. And, governmental privileges or benefits necessary to basic sustenance have often been viewed as being of greater constitutional significance than less essential forms of governmental entitlements"); Dunn v. Blumstein, 405 U.S. 330, 338, 31 L. Ed. 2d 274, 281-82, 92 S. Ct. 995, 1001 (1972) (applying strict-scrutiny analysis to invalidate, as violative of rights to travel and vote, Tennessee durational residency law that required a voter to be a resident of the state for one year and of the county for three months before the voter could vote).

In Attorney General v. Soto-Lopez, 476 U.S. 898, 911, 90 L. Ed. 2d 899, 911, 106 S. Ct. 2317, 2325 (1986), the Court, in a plurality opinion, invalidated a New York statute and constitutional provision that provided a preference in civil service employment to veterans who lived in the state when they entered military service, but denied a similar preference to resident veterans who lived outside the state when they entered military service. Justice Brennan delivered the opinion of the Court and noted that strict-scrutiny review should apply. Soto-Lopez, 476 U.S. at 906, 90 L. Ed. 2d at 907, 106 S. Ct. at 2322.

In other factual scenarios, the Supreme Court has declined to define the appropriate standard, although it has nevertheless struck down the enactments as unconstitutional under rational-basis review. In Hooper v. Bernalillo County Assessor, 472 U.S. 612, 86 L. Ed. 2d 487, 105 S. Ct. 2862 (1985), for example, the Supreme Court considered whether a New Mexico statute that granted a $2,000 property tax exemption to Vietnam veterans who resided in the state before May 8, 1976, but not to those who resided in the state on or after that date, violated the equal protection clause of the

fourteenth amendment. The Court did not address the proper standard of review to be applied in right-to-travel cases, noting that if the statutory scheme does not pass even the rationality test, the Court's inquiry ends. Hooper, 472 U.S. at 618, 86 L. Ed. 2d at 493, 105 S. Ct. at 2866. The Court held that the discrimination the statute made between veterans who established residency before the statutory date and those who arrived thereafter bore no rational relationship to one of the state's objectives--encouraging veterans to move to New Mexico--because the state set the eligibility date long after the triggering event, the date, had occurred. Hooper, 472 U.S. at 619, 86 L. Ed. 2d at 494, 105 S. Ct. at 2866-67. Next, the Court addressed the statute's second purpose--to reward veterans who served before May 8, 1976. The Court noted that resident veterans may be offered preferential treatment vis-a-vis nonveterans without offending the equal protection clause, but the statute at issue was problematic because it conferred a benefit only on established resident veterans--those who resided in the state before the statutory date. Hooper, 472 U.S. at 620-21, 86 L. Ed. 2d at 494-95, 105 S. Ct. at 2867-68. "The State may not favor established residents over new residents based on the view that the State may take care of 'its own,' if such is defined by prior residence. Newcomers, by establishing bona fide residence in the State, become the State's 'own' and may not be discriminated against solely on the basis of their arrival in the State after May 8, 1976." Hooper, 472 U.S. at 623, 86 L. Ed. 2d at 496, 105 S. Ct. at 2868. Accordingly, the Court held that the equal protection clause did not permit the State to establish a preference for established resident veterans over newcomers in the retroactive apportionment of an economic benefit. Hooper, 472 U.S. at 623, 86 L. Ed. 2d at 497, 105 S. Ct. at 2869; see also Zobel v. Williams, 457 U.S. 55, 60-64, 72 L. Ed. 2d 672, 677-80, 102 S. Ct. 2309, 2313-15 (1982) (refusing to adopt a standard of review and invalidating, as not withstanding even rational-basis scrutiny, Alaska's statutory scheme to distribute

to its adult citizens income derived from its petroleum revenues in varying amounts based upon their length of residency in the state; right to travel implicated because statute distinguished between residents based upon when they arrived in the state).

In another right-to-travel case, the Court did not discuss the level of scrutiny, although, arguably, in upholding a law, it applied rational-basis review. See Sosna v. Iowa, 419 U.S. 393, 406-09, 42 L. Ed. 2d 532, 544-46, 95 S. Ct. 553, 561-62 (1975) (upholding one-year residency requirement for maintaining divorce action on the basis that the state had a strong, traditional interest in setting the terms of and procedures for marriage and divorce; right to migrate not violated as appellant's access to desired state procedure was only temporarily delayed and because state may reasonably desire to insulate divorce decrees from collateral attack).

We conclude that rational-basis review is appropriate in this case. The Soto-Lopez Court held that the right to civil service employment, although not a necessity of life or the right to vote, "is unquestionably substantial. The award of bonus points can mean the difference between winning or losing civil service employment, with its attendant job security, decent pay, and good benefits." Soto-Lopez, 476 U.S. at 908, 90 L. Ed. 2d at 909, 106 S. Ct. at 2324. Also, the Court noted that the appellees had been permanently deprived of the veterans' credits they sought. Soto-Lopez, 476 U.S. at 909, 90 L. Ed. 2d at 909, 106 S. Ct. at 2324. "Such a permanent deprivation of a significant benefit, based only on the fact of nonresidence at a past point in time, clearly operates to penalize appellees for exercising their rights to migrate." Soto-Lopez, 476 U.S. at 909, 90 L. Ed. 2d at 909, 106 S. Ct. at 2324.

We conclude that private housing (or a property tax exemption) does not constitute a significant benefit or privilege like civil service employment (Soto-Lopez), subsistence welfare

benefits (Shapiro), nonemergency hospitalization or medical care (Memorial Hospital), or voting rights (Dunn). See also, e.g., Sylvester v. Commissioner of Revenue, 445 Mass. 304, 311, 837 N.E.2d 662, 667-68 (2005) (rational-basis review appropriate in assessing whether five-year residency requirement for partial real estate tax exemption for disabled veterans violated right to travel protected by equal protection clause; "residency requirement in the veterans' exemption does not prevent new arrivals from purchasing property in Massachusetts or from establishing a domicile here. It recognizes that the plaintiff, as a taxpayer, has no right to a particular rate of taxation, and it is underpinned *** by the well-settled law" protecting states from undue federal interference in the tax field); cf. Ball v. Village of Streamwood, 281 Ill. App. 3d 679, 683-85 (1996) (applying rational-basis review to determine whether a real estate transfer tax imposed on sellers but exempting those who purchased residences within the village violated the right to intrastate travel protected by the equal protection clause; court concluded that no vital government benefit or privilege was involved).

Thus, we now assess whether plaintiffs stated a claim that the Ordinance, under rational-basis review, infringes on the rights to housing and travel in violation of equal protection. Plaintiffs argue that they stated a claim that the Ordinance bears no rational relationship to a legitimate governmental interest because there is no rational basis for creating a class of persons, such as Ratjerowski, who live in the School District and pay taxes to fund the schools but live outside the corporate limits of the City, and treating them differently from people who live in both the School District and the City. Also, they contend that there is no rational basis for charging new residents a transfer tax when these same persons will be paying property taxes, just like other City residents, to support the School District. Finally, they urge that it was not appropriate to dismiss this case under section 2--615,

because there is case law invalidating state laws under rational-basis review. See Hooper, 472 U.S. at 623, 86 L. Ed. 2d at 497, 105 S. Ct. at 2869; Zobel, 457 U.S. at 60-64, 72 L. Ed. 2d at 677-80, 102 S. Ct. at 2313-15.

Defendants respond that the Ordinance, on its face, demonstrates, as does the Intergovernmental Agreement, that its purpose is to increase school funding to help offset the costs associated with new students moving into the City. Exempted from the tax are established residents who will not add new burdens to the schools when they purchase new homes in the City. Residents under this classification, according to defendants, do not create an additional burden to the district; conversely, nonresident homestead purchasers do add to the economic burden by potentially increasing the number of children entitled to attend the public schools. Requiring this class to pay the Transfer Tax rationally and legitimately advances the City's purpose for passing the Ordinance. Defendants urge that plaintiffs' allegations support the rational purpose and legitimate goal for the Transfer Tax--supplemental school funding. Defendants also assert that it is beyond dispute that providing adequate public schools is a legitimate governmental goal. Finally, they argue that the Ordinance does not violate equal protection merely because the City and the School District boundaries are not coterminous. Defendants contend that the fit need not be perfect; it need only avoid being arbitrary. For example, the fact that Rajterowski was not exempt from the Transfer Tax does not invalidate the Ordinance because it does not negate the Ordinance's legitimate purpose or make it discriminatory.

We conclude that plaintiffs failed to state a claim that the Ordinance is not rationally related to a legitimate governmental interest. "The rational basis test is particularly deferential in the context of classification made by tax laws, and if a set of facts can be reasonably conceived that would

sustain the classification, the tax must be upheld." Ball, 281 Ill. App. 3d at 683. Plaintiffs' allegations that the Transfer Tax's purpose--to address school underfunding--targets only certain classes of residents do not show that the law is arbitrary. The allegations, rather, reflect that the Ordinance makes a reasonable distinction between those adding new burdens to the schools (who are subject to the Transfer Tax) and those who do not add to the underfunding (who are exempt from paying the tax). That the "fit" is not perfect, due to the lack of coterminous boundaries, does not cause the law to fail for being arbitrary, under rational-basis review. City of New Orleans v. Dukes, 427 U.S. 297, 303, 49 L. Ed. 2d 511, 517, 96 S. Ct. 2513, 2517 (1976) ("States are accorded wide latitude in the regulation of their local economies under their police powers, and rational distinctions may be made with substantially less than mathematical exactitude. Legislatures may implement their program step by step").

Hooper and Zobel, wherein the Court struck down the enactments at issue as not withstanding even rational-basis review, do not compel a different conclusion. Although Hooper involved a property tax exemption, the residency requirement in that case was a fixed-date requirement: the New Mexico statute provided a property tax exemption for Vietnam veterans who had established residency in the state before May 8, 1976. Hooper, 472 U.S. at 618, 86 L. Ed. 2d at 493, 105 S. Ct. at 2862. The Court noted, quoting Zobel, that "the Constitution will not tolerate a state benefit program that 'creates fixed, permanent distinctions...between...classes of concededly bona fide residents, based on how long they have been in the State.' " Hooper, 472 U.S. at 623, 86 L. Ed. 2d at 496, 105 S. Ct. at 2869, quoting Zobel, 457 U.S. at 59, 72 L. Ed. 2d at 677, 102 S. Ct. at 2312. Here, the exemption is not a fixed-date enactment.

In sum, we conclude that the trial court did not err in dismissing count II of plaintiffs' amended complaint.

### C. Count III--Uniformity Clause of the Illinois Constitution

The uniformity clause of the Illinois Constitution provides that, "[i]n any law classifying the subjects or objects of non-property taxes or fees, the classes shall be reasonable and the subjects and objects within each class shall be taxed uniformly. Exemptions, deductions, credits, refunds and other allowances shall be reasonable." Ill. Const. 1970, art. IX, §2.

In count III of their amended complaint, plaintiffs alleged that the Ordinance's exemption violates the uniformity clause. They noted that the object of the Ordinance is to tax purchasers who move into the City who bring new students into the School District from outside the City, because they are the cause of the inadequate school funding. Plaintiffs alleged that the Ordinance created several classes of taxpayers: resident buyers who purchase nonhomestead property; resident buyers purchasing homestead property; and nonresident buyers purchasing homestead property. As to the first class, plaintiffs alleged that there is no real and substantial difference between resident homestead purchasers and resident nonhomestead purchasers and that the classification does not bear some reasonable relationship to the object of the Ordinance, especially when "the only reason" the City adopted the Ordinance was to address the School District's additional financial burden that stems from new students moving into the district. In plaintiffs' view, the resident nonhomestead purchasers are not adding to the School District's burden, yet they are not entitled to the same exemption as resident homestead purchasers.

As to the second and third classifications, plaintiffs alleged that distinguishing between resident and nonresident homestead buyers does not bear some reasonable relationship to the object

of the Ordinance when the reason for the Ordinance is to address the School District's additional financial burden that stems from new students moving into the district. They alleged that there is no exemption for nonresident buyers who do not have children or whose children do not attend public school in the School District (such as Rajterowksi); the Ordinance does not exempt buyers who move to the City but already lived in the School District (but outside the City) and thus were already paying property taxes and fees and are not bringing new students into the School District; and the Ordinance does not tax buyers who move into the School District but outside the City and who are bringing new children into the School District. Finally, they alleged that the Ordinance does not exempt nonresident or resident nonhomestead buyers moving into areas of the City that are not within the School District.

Plaintiffs further asserted that, if the School District is underfunded, the causes could be declining property tax revenue, increases in the number of children of City residents who qualify for the exemptions, increases in salary, changes in the amount of state and federal aid, increases in insurance costs, and other expenses. The complaint cited to a study, the "2007 Sycamore Housing Impact Analysis" prepared by Strategic Management Alliance in June 2007 (Study), which is not contained in the record on appeal. Plaintiffs alleged that the Study did not quantify the number of new students coming into the School District who were previously non-City residents. They alleged that the City "has not and can not actually demonstrate and determine the number of children moving into Sycamore from outside of Sycamore." Plaintiffs noted that the Study stated that 22.3% of new home buyers were from the City; that 49% of new detached homes built since June 2004 had no children living in them at the point of initial occupancy; and that 91% of townhouses and condominiums built during that time had no children living in them at initial occupancy. Further,

plaintiffs quoted from the Study with respect to sales of existing homes to non-City buyers: " 'The average of 2.60 people per existing housing unit re-occupied in 2006 is slightly lower than the Special Census findings from 2005 which showed 2.68 people lived in Sycamore's owner-occupied homes on average. This difference does not prove that there are less children, but it does suggest there are less people overall.' " Plaintiffs also quoted the following from the Study: " 'The findings suggest that, of those who responded to the mail survey who were transfer taxpayers [i.e., nonresident purchasers], 18% said that they were not sending their children to Sycamore schools.' " Plaintiffs alleged that the foregoing statements do not support the assertion that a large number of new students are coming into the City from outside and causing an economic burden on the School District. Thus, the difference among the classifications, in their view, is not real and substantial and the exemptions as drawn are unreasonable because there is no reasonable relationship between those taxed and those exempted. Finally, they assert that there is no reasonable relationship to the object of the legislation when the tax applies to purchasers who end up residing in those portions of the City that do not lie within the School District. For the following reasons, we conclude that the trial court did not err in dismissing count III.

"To survive scrutiny under the uniformity clause, a nonproperty tax or fee classification must: (1) be based on a real and substantial difference between the people taxed and those not taxed; and (2) bear some reasonable relationship to the object of the legislation or to public policy." (Emphases added.) Valstad v. Cipriano, 357 Ill. App. 3d 905, 914 (2005). "A plaintiff is not required to come forward with any and all conceivable explanations for the tax and then prove each one unreasonable ***." Geja's Café v. Metropolitan Pier & Exposition Authority, 153 Ill. 2d 239, 248 (1992). Rather, upon a good-faith uniformity challenge, the taxing body bears the "burden of producing a

justification for the classification." Valstad, 357 Ill. App. 3d at 914; see also Geja's Café, 153 Ill. 2d at 248. Next, "plaintiff bears the burden of persuading the court that the justification is not supported by facts or is insufficient as a matter of law." Valstad, 357 Ill. App. 3d at 914. Where the plaintiff fails to meet his or her burden, judgment is proper as a matter of law. Geja's Café, 153 Ill. 2d at 249; see also Valstad, 357 Ill. App. 3d at 914.

This court's inquiry under a uniformity clause challenge is relatively narrow:

"[T]he court is not required to have proof of perfect rationality as to each and every taxpayer. The uniformity clause was not designed as a straitjacket for the General Assembly. Rather, the uniformity clause was designed to enforce minimum standards of reasonableness and fairness as between groups of taxpayers." Geja's Café, 153 Ill. 2d at 252.

The uniformity clause "was not made to duplicate the limitation on the taxing power contained in the equal protection clause." Searle Pharmaceuticals, Inc. v. Department of Revenue, 117 Ill. 2d 454, 467 (1987). Rather, the clause "imposes more stringent limitations than the equal protection clause on the authority of a legislative body to classify the subjects and objects of taxation." DeWoskin, 306 Ill. App. 3d at 518. Nevertheless, a court's analysis is of limited scope because legislative enactments carry the presumption of validity and because broad latitude is granted to legislative classifications for taxing purposes. Allegro Services, Ltd. v. Metropolitan Pier & Exposition Authority, 172 Ill. 2d 243, 250 (1996).

As to the first part of our inquiry, i.e., whether the exemption is based upon a real and substantial difference between the people taxed and the people not taxed, this element is essentially conceded in defendants' favor on appeal. In their amended complaint, plaintiffs alleged, in a conclusory fashion, that there is no real and substantial difference between resident homestead

purchasers and resident nonhomestead purchasers. They also alleged, again in a conclusory fashion, that there is <u>no</u> real and substantial difference between resident and nonresident homestead purchasers. On appeal, plaintiffs concede that there <u>is</u> a factual distinction between resident and nonresident buyers of homestead real estate.

As to the second part of our inquiry, whether the tax classification bears some reasonable relationship to the object of the enactment or to public policy, plaintiffs argue that the need for funding for the School District is not reasonably related to the classification of <u>resident</u> buyers of homestead real estate versus <u>nonresident</u> buyers of homestead real estate. They note that nonresidents moving into the City who have no children do not add any economic strain to the School District. According to plaintiffs, City residents who are also School District residents <u>do</u> cause financial strain on the School District. Nonresidents moving into the City and the School District "may" cause financial strain, "but not any more of a strain than the residents who are already burdening the School District." Plaintiffs assert that the stated purpose of the Ordinance, to fund the School District, cannot be met when it taxes those who may perhaps cause financial strain on the School District in the future, while failing to tax the one group known to already cause financial strain on the School District. Further, plaintiffs argue that the City cannot determine the number of children moving into the City from outside the City. As they did in their complaint, plaintiffs note that the City's Study did not quantify the new students entering the School District from outside the City. Plaintiffs argue that the Study shows that nonresidents are not causing a school funding crisis. Thus, the differential classification between residents and nonresidents is not reasonably related to the school funding issue. Plaintiffs contend that, once a nonresident becomes a resident, he or she begins paying property taxes to fund his or her use of the schools. An additional tax based upon the

nonresident's failure to pay past property taxes for a benefit he or she was not receiving prior to purchasing property within the City is not reasonable. Plaintiffs argue that this is especially true given that the only group certain to use those benefits is the one group exempt from paying the tax.

Additionally, plaintiffs take issue with the fact that the Ordinance does not exempt purchasers of nonhomestead real property, including residents who purchase nonhomestead real property. They note that the exemption does not apply to any buyers of commercial property, even though these buyers do not put any more strain on the School District than resident buyers of homestead real estate, the only group excluded from paying the Transfer Tax. Finally, plaintiffs argue that a uniformity clause analysis necessarily requires analysis of the facts and circumstances surrounding the Ordinance's enactment and purpose and a determination of the least restrictive means of achieving the legislative goal and, thus, precludes dismissal on the pleadings.

Defendants respond that the face of plaintiffs' amended complaint provides a reason for the Ordinance that is clearly related to the classification of resident purchasers of homestead property as exempt from paying the Transfer Tax. They point to plaintiffs' allegation that "[t]he object of the legislation is to tax buyers who move into Sycamore who bring new students into the School District from outside of Sycamore because the Defendant's [sic] assert that is what is causing what Defendant[s] believe to be inadequate school funding." Defendants further note that plaintiffs alleged that the "only reason" the City adopted the Ordinance "is to address the additional financial burden to the School District that stems from new students moving into the School District." Defendants argue that a reasonable basis for the classification exempting resident homestead purchasers, who "by definition" will not be bringing new students into the School District, was actually pleaded in the amended complaint.

-28-

As to nonhomestead property, defendants argue that such purchasers include those who will use the property as rental property, which could reasonably be expected to add families that would add to the School District's financial burden. Nonhomestead property also includes commercial property, which, defendants assert, adds to a community's growth, which necessarily increases the burden upon the School District. Thus, defendants reason, when nonhomestead property is purchased, the Transfer Tax imposed upon the purchase at the very least bears some reasonable relation to the purchase. Next, as to the Study, defendants argue that: (1) plaintiffs' allegation that the City cannot demonstrate the number of children moving into the City from outside it has no factual basis in the complaint; (2) quantification of the children entering the City is not essential to the inquiry because it is clear that homestead purchasers who already live in the City will not be burdening the School District with additional students by virtue of their purchase of new homesteads within the City, while nonresident homestead purchasers "have the clear potential to do so"; and (3) the burden is not on defendants to prove any particular set of facts; so long as there is a set of facts that can reasonably be conceived that would sustain the classification, as there is here, the classification must be upheld.

We address first plaintiffs' argument that a uniformity clause challenge necessarily involves a factual analysis and, therefore, precludes dismissal on the pleadings. We disagree. It has been noted that, in the context of a uniformity clause challenge, a section 2--615 motion "is generally *** inappropriate" because such claims involve a burden-shifting arrangement and summary judgment "is more suited to the task." DeWoskin, 306 Ill. App. 3d at 523. However, "[w]hen the reasonableness of a tax classification is determinable as a matter of law, a uniformity challenge may be decided in the context of a section 2--615 motion." DeWoskin, 306 Ill. App. 3d at 523 (movie

theater patron challenged county amusement tax; court held that as a matter of law, there was a reasonable basis for exempting from county amusement tax patrons of organizations benefitting community and not patrons of commercial organizations; exclusion of raffles and intertrack wagering facilities from the definition of amusement was reasonable because participatory activities and the operation of amusement devices are fundamentally different from passive entertainment, and their exclusion was not arbitrary or unreasonable as a matter of law; however, whether the size of an entertainment facility or the frequency with which an entity offered amusement activities justified an exemption presented factual questions, as did the assessment of an exemption for amusements sponsored by military and veterans organizations).

As to the Ordinance's differential treatment of residents and nonresidents, we conclude as a matter of law that the exemption from the Transfer Tax for residents (but not for nonresidents) bears a reasonable relationship to the school underfunding issue. It is certainly reasonable to impose upon new residents the one-time burden, via the Transfer Tax, of contributing to the maintenance of a School District. New residents are a reasonable class to target for the imposition of such a burden, as they generally will add to the school population and costs. Plaintiffs' attempt to characterize the Ordinance as imposing a tax burden on new residents for past school underfunding issues (for which they necessarily are not responsible) is unavailing because it is not clear on this record that this is the Ordinance's purpose. We cannot discern from this record that the Ordinance's purpose (sole or otherwise) is to address an existing underfunding issue. It is equally plausible/reasonable to read the Ordinance as a forward-looking enactment that seeks to have new users of the schools (i.e., primarily new City residents) bear the cost at the commencement of their City residency for the impact they, as a group, will have on the School District's finances. We will not second-guess the City's

determination that property taxes alone are inadequate to address the added financial burden that new students/residents impose on the schools.

Plaintiffs' reliance on the Study is misplaced, as the excerpts recited in the amended complaint do not provide a sufficient factual basis for plaintiffs' allegation that new residents are not causing school underfunding. Indeed, the excerpts themselves undercut plaintiffs' allegations: (1) the "difference [i.e., the slight decrease from 2005 to 2006 in the average number of people in existing homes purchased by non-City buyers] does not prove that there are less children, but it does suggest that there are less people overall" (emphasis added); (2) "22.3% of new home buyers were from Sycamore," which implies that the overwhelming majority (almost 80%) were nonresidents; (3) "49% of new detached homes built since June of 2004 had no children at all living in them at the point of initial occupancy," which implies that 51%, or a majority, did have children living in them; and (4) "of those who responded to the mail survey who were transfer taxpayers [i.e., nonresident purchasers], 18% said that they were not sending their children to Sycamore schools," which implies that the overwhelming majority were doing so.

As to the Ordinance's treatment of homestead and nonhomestead purchasers, we conclude as a matter of law that the exemption from the Transfer Tax for homestead purchasers (but not for nonhomestead purchasers) bears a reasonable relationship to the issue of school funding. The uniformity clause does not require that the class taxed be the sole or primary beneficiary of the tax. Arangold Corp. v. Zehnder, 329 Ill. App. 3d 781, 798 (2002). "Rather, courts have held that uniformity is satisfied even when those taxed benefit only indirectly [citation], or when others not taxed benefit as well." Arangold, 329 Ill. App. 3d at 798. As defendants note, commercial property encompasses rental property, and renters could reasonably be expected to add to the School District's

student population. Further, nonresidential commercial property can reasonably be expected to add to a community's growth through additional employment opportunities. These opportunities certainly attract to the City families whose children would generally be expected to attend the public schools.

For similar reasons, plaintiffs' allegations that certain other classifications should have been exempted from the tax fail. They complain that there is no exemption for nonresident purchasers who have no children or whose children do not attend public schools. Plaintiffs also protest that there is no exemption for purchasers who formerly lived in the School District and moved to the City and for purchasers who move to areas of the City that are not within the School District. Plaintiffs' allegations fail to sufficiently state a uniformity clause claim because, as we noted above with respect to nonhomestead purchasers, there exists an interrelationship wherein those classifications of taxpayers indirectly benefit as a result of the Transfer Tax.

Ball v. Village of Streamwood, 281 Ill. App. 3d 679 (1996), is instructive. In Ball, taxpayers challenged the constitutionality of an exemption to a village's real estate transfer tax that was imposed, unlike in this case, upon sellers of real property. The exemption relieved sellers who purchased new residences within the village from payment of the transfer tax. In assessing a certified question[4] asking whether the exemption violated the taxpayers' rights to uniformity, the court first concluded that there was a difference between those taxed (those relocating outside the village) and those not taxed (those remaining in the village). Ball, 281 Ill. App. 3d at 685. Next, the court addressed whether the classification bore a reasonable relationship to the object of the enactment. Referring to its earlier holding (in assessing, under rational-basis review, whether the

[4]The question was certified under Supreme Court Rule 308 (134 Ill. 2d R. 308).

exemption violated the taxpayers' rights to <u>intrastate</u> travel) that the village articulated "a rational basis for structuring its tax in this manner" (<u>Ball</u>, 281 Ill. App. 3d at 685), specifically, that the exemption encouraged community continuity and values, the court concluded that the tax and the exemption did not violate the uniformity clause of the Illinois Constitution. <u>Ball</u>, 281 Ill. App. 3d at 685;[5] see also <u>Stahl v. Village of Hoffman Estates</u>, 296 Ill. App. 3d 550, 558-59 (1998) (finding <u>Ball</u> controlling and affirming section 2--615 dismissal of action challenging constitutionality of transfer tax exemption for sellers who lived on the property for one year if they purchased another residence in the village within a certain period; the taxpayers who challenged the exemption moved out of the village after transferring their property).

Arguably, school underfunding presents a more pressing issue than the preservation of community continuity or values, as was the issue in <u>Ball</u>. In any event, the community-values-and-continuity rationale present in <u>Ball</u> is also a consideration here due to, as we noted above, the interrelationship between various community groups and the quality/funding of the community's public schools.

---

[5]The <u>Ball</u> court relied on <u>Nordlinger v. Hahn</u>, 505 U.S. 1, 120 L. Ed. 2d 1, 112 S. Ct. 2326 (1992), wherein the Supreme Court addressed an equal protection challenge (without a right-to-travel component) to a California law requiring property reassessment upon a change in ownership. The law exempted from reassessment property transfers by persons over age 55 and transfers between parents and their children. The <u>Ball</u> court noted that the Court upheld the exemptions, concluding that a " '[s]tate has a legitimate interest in local neighborhood preservation, continuity, and stability.' " <u>Ball</u>, 281 Ill. App. 3d at 684, quoting <u>Nordlinger</u>, 505 U.S. at 12, 120 L. Ed. 2d at 13, 112 S. Ct. at 2333.

In sum, we conclude that the trial court did not err in dismissing count III of plaintiffs' amended complaint.

### D. Count IV--the City's Constitutional Authority

In count IV, plaintiffs alleged that, in enacting the Ordinance and entering into the Intergovernmental Agreement, the City, a home rule unit, exceeded its constitutional (i.e., home rule) authority in two respects: it (1) circumvented the School Code (105 ILCS 5/1--1 et seq. (West 2008)); and (2) exceeded its jurisdiction. For the following reasons, we conclude that the trial court did not err in dismissing count IV.

Preliminarily, we note that the Illinois Constitution provides that "[h]ome rule units may exercise and perform concurrently with the State any power or function of a home rule unit to the extent that the General Assembly by law does not specifically limit the concurrent exercise or specifically declare the State's exercise to be exclusive." (Emphases added.) Ill. Const. 1970, art. VII, §6(I). Home rule units' powers are liberally construed. Ill. Const. 1970, art. VII, §6(m). As previously noted, a transfer tax in and of itself does not "offend any constitutional provisions." Stahl, 296 Ill. App. 3d at 554; see also 65 ILCS 5/8--3--19 (West 2006) (authorizing home rule municipalities to impose, upon prior approval by referendum, real estate transfer taxes).

The constitution permits intergovernmental cooperation. It provides:

"Units of local government and school districts may contract or otherwise associate among themselves *** to obtain or share services and to exercise, combine, or transfer any power or function, in any manner not prohibited by law or by ordinance. *** Participating units of government may use their credit, revenues, and other resources to pay costs and to

service debt related to intergovernmental activities." (Emphasis added.) Ill. Const. 1970, art. VII, §10(a).

Similarly, the Intergovernmental Cooperation Act addresses intergovernmental cooperation:

"Any power or powers, privileges, functions, or authority exercised or which may be exercised by a public agency[6] of this State may be exercised, combined, transferred, and enjoyed jointly with any other public agency of this State and jointly with any public agency of any other state or of the United States to the extent that laws of such other state or of the United States do not prohibit joint exercise or enjoyment and except where specifically and expressly prohibited by law." (Emphasis added.) 5 ILCS 220/3 (West 2008).

The Intergovernmental Cooperation Act also permits intergovernmental contracts:

"Any one or more public agencies may contract with any one or more other public agencies to perform any governmental service, activity or undertaking or to combine, transfer, or exercise any powers, functions, privileges, or authority which any of the public agencies entering into the contract is authorized by law to perform, provided that such contract shall be approved by the governing bodies of each party to the contract and except where specifically and expressly prohibited by law. Such contract shall set forth fully the purposes, powers, rights, objectives and responsibilities of the contracting parties." (Emphasis added.) 5 ILCS 220/5 (West 2008).

As to the first aspect of count IV, plaintiffs alleged that the Ordinance created a new source of funds to supplement the School District's operating revenues and, as such, circumvented the

---

[6]The term "public agency" includes units of local government and school districts. 5 ILCS 220/2 (West 2008).

School Code's (105 ILCS 5/1--1 et seq. (West 2008)) procedures for raising tax revenues for schools. Plaintiffs alleged that, in the School Code, the legislature established a mechanism for funding public education. Plaintiffs alleged that increases in school funding must be the subject of proper school board resolution and that the school board must submit to the School District's voters for referendum a proposition to increase the annual tax rate for educational purposes. 105 ILCS 5/17--3 (West 2008). They further alleged that the Ordinance that adopted the Transfer Tax (that is to be used to fund the School District) was not a referendum submitted to all School District voters and was not treated as a tax levy for educational purposes, as required by the School Code. Conceding that some statutes specifically authorize municipalities to give certain portions of their tax revenues to public school districts,[7] plaintiffs alleged that there is no statutory authority, including the School Code, permitting a municipality to give Transfer Tax revenues to any public school district. Accordingly, they alleged that the City, without legal authority, circumvented the School Code by raising tax revenues for schools without following the procedures set forth in the statute.

---

[7]As an example, plaintiffs specifically referred in their complaint to the Local Government Distributive Fund established in the State Revenue Sharing Act (30 ILCS 115/0.1 et seq. (West 2008)), which requires the Treasurer to allocate to a special fund certain income tax revenues and pay therefrom certain amounts to municipalities and counties. 30 ILCS 115/1 (West 2008). Municipalities and counties must use such funds "solely for the general welfare of the people of the State of Illinois, including financial assistance to school districts, any part of which lie within the municipality or county, through unrestricted block grants for school purposes carried out within the municipality or county making the grant" (30 ILCS 115/3 (West 2008)).

"[T]he legislature has enacted a comprehensive scheme for the creation, management and operation of Illinois schools. *** Thus the legislature, pursuant to the constitutional mandate, exercises plenary power over the Illinois school system." Board of Education of School District No. 150 v. City of Peoria, 76 Ill. 2d 469, 476 (1979); see also Ill. Const. 1970, art. X, §1 ("The State has the primary responsibility for financing the system of public education" (emphasis added)).

Section 17--3 of the School Code, upon which plaintiffs rely, addresses additional tax levies and provides, in relevant part:

"The school board in any district having a population of less than 500,000 inhabitants may, by proper resolution, cause a proposition to increase, for a limited period of not less than 3 nor more than 10 years or for an unlimited period, the annual tax rate for educational purposes to be submitted to the voters of such district at a regular scheduled election." (Emphases added.) 105 ILCS 5/17--3 (West 2008).

Defendants respond that the City may share with the School District the revenue generated by the Transfer Tax. They note that, as a home rule entity, the City can exercise any power pertaining to its government and affairs (Ill. Const. 1970, art. VII, §6(a)). Further, defendants assert that both the constitution and statutes permit intergovernmental cooperation. As to the School Code, defendants argue that it does not prohibit a school district from receiving funds from sources other than its own property tax levy and, in any event, the City, not the School District, passed the Ordinance at issue. The City, according to defendants, is not subject to the School Code's provisions. The statute establishes a mechanism by which a school district may submit a referendum to its voters to increase the district's annual tax levy; in enacting the Ordinance, the City did not and could not increase the School District's annual tax levy or circumvent the School Code. Defendants

argue that School District funding pertains to the City's government and affairs because it promotes the general prosperity and welfare of the community and that the expenditure of tax money need not benefit all taxpayers equally to be constitutional.

We agree with defendants that plaintiffs' reliance on section 17--3 of the School Code is misplaced because that provision addresses the obligations of school boards, not municipalities. We also agree with defendants that, in their complaint, plaintiffs pointed to no provision in the School Code that specifically restricts a municipality's powers to forward monies to school districts. Further, the constitution provides that the State has primary responsibility for financing public education. Ill. Const. 1970, art. X, §1. However, it does not confer on the State exclusive responsibility for school funding. Because a home rule unit may exercise concurrently with the State any power of a home rule unit, in the absence of any specific legislative limitation on home rule units' powers, or the State's exclusive exercise of power, over schools, we cannot conclude that plaintiffs stated a claim that the City exceeded its authority by circumventing the School Code.

We find City of Peoria instructive. In that case, a home rule municipality enacted ordinances imposing taxes upon the witnessing of or participation in amusements and upon the privilege of purchasing food or alcoholic beverages served at restaurants or taverns. The taxes were paid by consumers, but the ordinances also imposed on establishment operators and owners the duties of collecting the taxes and keeping records of tax receipts and imposed on them the obligation to file tax returns reflecting such receipts. The school district and park district challenged the ordinances as unenforceable against them. As to the school district, the supreme court held that the ordinances imposed duties upon the board of education that were not authorized, such as the keeping of records, examination of books, and collection of the taxes. City of Peoria, 76 Ill. 2d at 476-77. These duties

were over and above those imposed upon the entity by the legislature. City of Peoria, 76 Ill. 2d at 476-77. Further, the court held that the ordinances conferred on the school district powers that it did not have by statute, such as the power to collect taxes on behalf of the city and to hold them as trustee. City of Peoria, 76 Ill. 2d at 477. Thus, the ordinances constituted the unauthorized regulation of the school district, contrary to the constitution (Ill. Const. 1970, art. X, §1 ("The State shall provide for an efficient system of high quality public educational institutions and services")). City of Peoria, 76 Ill. 2d at 477.[8]

City of Peoria is distinguishable because, in that case, the municipality's ordinances burdened the school district by requiring it to, among other things, collect the municipal tax and maintain records. Here, the Transfer Tax merely confers benefits to the School District by forwarding to it funds to enable the district to carry out its operations. This distinction is critical because the City, via the Ordinance and by entering into the Intergovernmental Agreement, has neither infringed on the State's power nor burdened the School District.

Plaintiffs next argue that the City has no obligation to solve a school revenue shortage and, thus, any transfer of funds to the district constitutes a donation or gift. In plaintiffs' view, the City cannot donate money to the School District because this does not pertain to the City's government and affairs. See Ill. Const. 1970, art. VII, §6(a) ("a home rule unit may exercise any power and perform any function pertaining to its government and affairs including, but not limited to, the power *** to tax").

---

[8]As to the park district, the court held that the ordinances did not constitute unauthorized regulation, because municipalities had explicit statutory authority to establish and maintain parks. City of Peoria, 76 Ill. 2d at 477.

Plaintiffs rely on an Attorney General opinion that addressed a proposed agreement to share sales tax revenue between the City of Belleville, a home rule unit, and St. Clair County. 1978 Ill. Att'y Gen. Op. 165. The proposed agreement provided that, whenever the city received sales tax revenue from businesses located in territory that had been newly annexed by the city, the city would share a portion of the tax with the county, which was no longer receiving tax revenues from the businesses. The county was not obligated to provide the city with any consideration for the proposed agreement. The Attorney General opined that the city did not have authority to enter into the proposed agreement and that the agreement was, therefore, invalid. 1978 Ill. Att'y Gen. Op. 165. Although constitutional and statutory provisions addressing intergovernmental cooperation authorized cities to contract with counties, they did not authorize cities to donate city funds to counties, which was, in essence, what the city was proposing to do. 1978 Ill. Att'y Gen. Op. 165. According to the Attorney General, a home rule municipality's powers are limited to strictly local affairs and do not encompass those involving other municipalities, the county, or the State. 1978 Ill. Att'y Gen. Op. 165. Thus, the city was under no legal obligation to assist the county in remedying the financial problems that were caused when businesses located in territory annexed by the city were no longer subject to the county's service occupation tax. 1978 Ill. Att'y Gen. Op. 165.

Plaintiffs' reliance on the foregoing Attorney General opinion is misplaced. In our view the critical distinction between the Transfer Tax and the City of Belleville's proposed arrangement with St. Clair County is the nature of the benefit received by the party collecting the tax. In this case, the City benefits from forwarding Transfer Tax revenues to the School District because better-financed schools benefit the community (which includes the portions of the School District that are within the City) as a whole. In the scheme proposed by the City of Belleville, as the Attorney General

specifically noted, the county was not obligated under the agreement to pay any consideration therefor. Indeed, for sharing sales tax revenue with the county, Belleville received no benefit in return. Its transfer of tax revenue was purely gratuitous, which is not the case here (as we can discern from the complaint's allegations).

For the same reason that we reject plaintiff's reliance on the Attorney General Belleville opinion, we also reject the second aspect of plaintiffs' claim in count IV. Therein, plaintiffs alleged that Transfer Tax revenues will be used to fund the School District, which includes areas outside the City's corporate boundaries and jurisdiction (because the entities' boundaries are not coterminous). They alleged that the City has no authority to pass or enforce an ordinance that has an extraterritorial effect by disbursing tax monies to the School District. In our view, plaintiffs failed to state a claim that the City exceeded its authority. Again, better-financed schools benefit the community as a whole. See, e.g., Board of Library Directors v. City of Lake Forest, 17 Ill. 2d 277, 285 (1959) (upholding statute requiring township to pay to cities the proceeds of township library tax collected on property lying within cities; fact that libraries maintained by the cities were located outside the boundaries of township did not invalidate the levy; "the true test is the enhancement of the general welfare of the township levying the tax"). The allegation that there are portions of the School District that are not within the City's boundaries does not form the basis of a claim for relief.

In summary, we conclude that the trial court did not err in dismissing plaintiffs' claim in count IV that the City exceeded its constitutional authority.

E. Count V--the School District's Authority

Finally, in count V, plaintiffs asserted that the School District exceeded its constitutional authority by entering into an intergovernmental agreement for the City to collect taxes and give them to the School District and for the School District to accept the tax revenues.

Specifically, plaintiffs alleged that, since the Transfer Tax will be used to fund the School District, which includes areas outside the City's boundaries and jurisdiction, the Ordinance has an extraterritorial effect. An intergovernmental agreement, plaintiffs alleged, cannot be used in this manner.

They also alleged that the School Code and other statutes provide a complete and specific method for financing public schools. For example, the School District, under the School Code, can levy only ad valorem (i.e., according to value) taxes on real property (105 ILCS 5/17--2 (West 2008) ("The school board of any district having a population of less than 500,000 inhabitants may levy a tax annually, at not to exceed the maximum rates and for the specified purposes, upon all the taxable property of the district at the value, as equalized or assessed by the Department of Revenue as follows")). Plaintiffs alleged that the School Code does not give the School District the authority to impose the Transfer Tax either directly or indirectly through the City and does not give the School District the authority to receive Transfer Tax revenues from the City.

Thus, in summary, plaintiffs alleged that the Intergovernmental Agreement is invalid because it has an extraterritorial effect and because the School District does not have statutory authority to impose (directly or indirectly) a transfer tax or to receive transfer tax revenues. On appeal, plaintiffs address only the statutory authority and not the extraterritorial aspect of their claim. We limit our analysis accordingly and, for the following reasons, conclude that the trial court did not err in dismissing count V.

We begin by reviewing the powers granted to non-home-rule entities such as the School District and the authority they may exercise via intergovernmental agreements. The constitution provides that school districts "shall have only powers granted by law." Ill. Const. 1970, art. VII, §8. This provision preserves the concept of "Dillon's Rule." Under "Dillon's Rule," non-home-rule units possess only those powers that are specifically conveyed by the constitution or by statute or that are necessarily implicit from the express authority. Commonwealth Edison Co. v. City of Warrenville, 288 Ill. App. 3d 373, 380 (1997); Fischer v. Brombolich, 207 Ill. App. 3d 1053, 1059 (1991). Because a non-home-rule entity derives its powers only from "an express grant from the legislature, the statutes granting this power are strictly construed, and any doubt concerning an asserted power is resolved against the [non-home-rule entity]." Fischer, 207 Ill. App. 3d at 1059.

As plaintiffs note, the Attorney General has, in various opinion letters, consistently opined that non-home-rule entities may not, by entering into intergovernmental agreements, circumvent statutory requirements or limitations. See, e.g., 2005 Ill. Att'y Gen. Op. No. 05--010 ("the Intergovernmental Cooperation section of the Constitution and its statutory counterpart, the Intergovernmental Cooperation Act, are not grants of authority to undertake jointly functions that the cooperating entities cannot undertake individually"); 2000 Ill. Att'y Gen. Op. No. 00--015 (constitutional and statutory intergovernmental cooperation provisions "are not *** independent grant[s] of authority and cannot authorize an entity to do that which is not otherwise authorized or permitted by law"); 1998 Ill. Att'y Gen. Op. No. 98--014 (same).

Certain opinion letter factual scenarios are instructive. In one letter, the Attorney General opined that a public group self-insurance fund, whose members consisted of units of local government and state agencies, could (as to certain of its members) expand its coverage to provide

group health insurance benefits for its members' employees and their dependents. 1998 Ill. Att'y Gen. Op. No. 98--014. Specifically, counties and home rule units could jointly self-insure the benefits, but non-home-rule municipalities did not have that authority because they did not have the independent authority to self-insure and the Intergovernmental Cooperation Act did not independently grant them authority to do so. 1998 Ill. Att'y Gen. Op. No. 98--014.

In another opinion, the Attorney General addressed the authority of a township (which is a non-home-rule unit) to contract with a private corporation to provide for the collection and disposal of waste and recyclables from residences within the township's unincorporated areas, as well as commercial waste generated by the township. The questions posed were whether referendum approval was a prerequisite to the exercise of such authority and whether, in the absence of referendum approval, the township could implement the plan through an intergovernmental agreement between it and the county. The Attorney General opined that (pursuant to the relevant statute) referendum approval was a prerequisite to the township's contemplated contract and that the referendum requirement could not be circumvented through the use of an intergovernmental agreement with the county. 2000 Ill. Att'y Gen. Op. No. 00--015. "An intergovernmental agreement by which the county would facilitate waste collection in a single township, without relation to waste management in surrounding areas, is not consistent with the apparent legislative intent of" a statute permitting county-wide waste management plans. 2000 Ill. Att'y Gen. Op. No. 00--015. Further, another statute that permitted counties to contract with various governmental entities for waste disposal did not specifically mention townships. 2000 Ill. Att'y Gen. Op. No. 00--015.

Finally, in another letter, the Attorney General opined that an entity formed under an intergovernmental cooperation agreement between home rule and non-home-rule municipalities was

bound by statutory limitations governing its <u>non-home-rule</u> members. 2005 Ill. Att'y Gen. Op. No. 05--010. Specifically, home rule members were exempt from competitive bidding statutes when seeking contractors to develop the proposed South Suburban Airport in Peotone. 2005 Ill. Att'y Gen. Op. No. 05--010. Non-home-rule municipalities had more limited powers and were subject to the State's procurement requirements. 2005 Ill. Att'y Gen. Op. No. 05--010.

We find the foregoing opinions well reasoned and persuasive. See <u>Vine Street Clinic v. HealthLink, Inc.</u>, 222 Ill. 2d 276, 283 (2006) (Attorney General's well-reasoned opinions "interpreting or construing an Illinois statute are persuasive authority and are entitled to considerable weight in resolving a question of first impression, although they do not have the force and effect of law"). We reject defendants' assertion that the foregoing Attorney General opinion letters are inapposite because the statutes at issue "expressly prohibited" the non-home-rule entities from performing certain acts. To the contrary, the provisions at issue in the opinions did <u>not</u> expressly prohibit certain acts. See 2005 Ill. Att'y Gen. Op. No. 05--010 (stating that section 11--103--10 of the Municipal Code (65 ILCS 5/11--103--10 (West 2004)) allows municipalities to jointly exercise their statutory powers to operate airports, but does <u>not</u>, expressly or impliedly, remove the limitations imposed on them by other laws); 2000 Ill. Att'y Gen. Op. No. 00--015 (opining that article 210 of the Township Code (60 ILCS 1/210--5 <u>et</u> <u>seq.</u> (West 1998)) expressly authorized townships, with referendum approval, to contract for waste disposal and that referendum requirement could not be circumvented through use of intergovernmental agreement with a county); 1998 Ill. Att'y Gen. Op. No. 98--014 (noting that section 10--4--2 of the Illinois Municipal Code (65 ILCS 5/10--4--2 (West 1996)) does not grant non-home-rule municipalities the option to self-insure, but not noting that it expressly prohibited the option).

Thus, as we have noted: (1) non-home-rule units such as the School District may exercise only those powers granted to them by the constitution or by statute, together with such implied powers as are essential, not merely convenient, to carry out their express powers; and (2) the power to cooperate intergovernmentally cannot authorize an agreement that contravenes statutory prohibitions or limitations that apply to the participating entities. In count V, plaintiffs sufficiently alleged the foregoing. They alleged that the School District, as a public school district, did not have the authority to enter into an intergovernmental agreement to enact a Transfer Tax or receive Transfer Tax revenues where the School Code does not authorize such acts.[9]

Next, we assess the School District's statutory authority to enact the Transfer Tax or receive Transfer Tax revenues. School boards or districts do not have an inherent power to levy taxes. In re Application of the Du Page County Collector, 294 Ill. App. 3d 868, 870 (1998). Rather, that power is granted by the legislature and is strictly construed. Du Page County Collector, 294 Ill. App. 3d at 870.

Plaintiffs argue that they adequately pleaded that, although the City may have the authority to enact a Transfer Tax, the School District does not have independent authority to enact (directly or indirectly) such a tax to generate additional revenues. Plaintiffs assert that, like the township in the opinion letter addressing waste collection, the School District cannot circumvent the School

_____

[9]Technically, although they did allege that the School District is a public school district that exceeded its constitutional authority, plaintiffs did not specifically allege that the School District is a non-home-rule entity. Elsewhere in their complaint, they alleged that the City is a home rule unit. We do not find plaintiffs' failure to specifically allege that the School District is a non-home-rule entity fatal to their claim.

Code or other statutes by entering into an intergovernmental agreement to receive Transfer Tax revenues when it does not have independent authority to do so. Plaintiffs argue that the School Code authorizes the School District to impose property tax levies, but not transfer taxes. Thus, an intergovernmental agreement cannot give the School District authority to receive tax revenues generated by the City's Transfer Tax.

Defendants respond that the City and not the School District enacted the Transfer Tax pursuant to its statutory and constitutional authority and assert that plaintiffs have not provided any legal authority expressly prohibiting the distribution of Transfer Tax proceeds to the School District. They urge that plaintiffs, therefore, have failed to state a claim that the School District exceeded its authority or that the Intergovernmental Agreement is invalid. Defendants further note that section 10--20 of the School Code grants school districts wide powers as to school matters and shows that school districts are not restricted to powers expressly enumerated in the School Code. Section 10--20 of the School Code provides:

"The school board has the powers enumerated in the Sections of this Article following this Section. This enumeration of powers is not exclusive, but the board may exercise all other powers not inconsistent with this Act that may be requisite or proper for the maintenance, operation, and development of any school or schools under the jurisdiction of the board. This grant of powers does not release a school board from any duty imposed upon it by this Act or any other law." (Emphasis added.) 105 ILCS 5/10--20 (West 2008).

Subsequent statutes address school boards' powers to, inter alia, "provide for the revenue necessary to maintain schools in their districts" (105 ILCS 5/10--20.3 (West 2008)), visit and inspect schools (105 ILCS 5/10--20.6 (West 2008)), appoint teachers and fix their salaries (105 ILCS 5/10--20.7

(West 2008)), and develop and implement policies of hiring minority teachers (105 ILCS 5/10--20.7a (West 2008)). Plaintiffs respond that section 10--20 grants school districts only incidental powers and grants them only so long as those powers do not conflict with any other state law.

We conclude that plaintiffs failed to state a claim that the Intergovernmental Agreement is invalid because the School District exceeded its authority in imposing (directly or indirectly) a Transfer Tax and agreeing to receive Transfer Tax revenues. We disagree with plaintiffs that this case is similar to the Attorney General opinion letter addressing waste collection. There, the Attorney General opined that a township could not circumvent a statutory limitation (i.e., referendum approval) through the use of an intergovernmental agreement. Here, in their amended complaint, plaintiffs alleged that the enactment of a transfer tax and the receipt of revenues thereunder were not consistent with, specifically, the School Code provision that specifically permits school boards to impose ad valorem taxes on real property (105 ILCS 5/17--2 (West 2008)). Plaintiffs' complaint alleged that school districts can levy only property taxes and not transfer taxes and, thus, in the absence of specific authority to enact the Transfer Tax, the Intergovernmental Agreement is void. In our view, plaintiffs overlook the fact that the City and not the School District enacted the Transfer Tax and that none of the School Code provisions upon which they rely prohibits a school district from receiving transfer tax revenues. Accordingly, we conclude that the trial court did not err in dismissing count V.

## IV. CONCLUSION

For the foregoing reasons, the judgment of the circuit court of De Kalb County is affirmed.

Affirmed.

HUTCHINSON and BURKE, JJ., concur.